*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARIAM BIBI, f/k/a | ) | |
| MARIAM RAJA, | ) | |
| | ) | Supreme Court No. S-15987 |
| Appellant, | ) | |
| v. | ) | Superior Court No. 3AN-14-05970 CI |
| | ) | |
| | ) | O P I N I O N |
| KEVIN ELFRINK, JAVED RAJA, | ) | |
| and ANY OTHER OCCUPANTS, | ) | |
| | ) | No. 7202 – September 22, 2017 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Gail M. Ballou, Law Office of Gail M. Ballou, Fairbanks, for Appellant. Theodora Accinelli, RCO Legal — Alaska, Inc., Anchorage, for Appellee Kevin Elfrink. No appearance by Appellee Javed Raja.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice.

# I. INTRODUCTION

Mariam Bibi and Javed Raja married and later bought a home in Anchorage with loans from IndyMac Bank, F.S.B. (IndyMac). IndyMac's loans were secured by deeds of trust on their home. The couple later received an additional loan of around $10,000 from Kevin Elfrink. The loan from Elfrink charged 10% interest but also

included a funding fee of $4,000 rolled into the rest of the loan for payment over time rather than charged and paid at the outset. Over the course of six years, the couple made irregular payments, increased the loan balance three times until it exceeded $25,000, and eventually defaulted. Elfrink initiated foreclosure proceedings and then bought the house at his own foreclosure sale by credit-bidding all money he asserted was due to him under the modified promissory note, satisfying the couple's debt to him.

Following the foreclosure, Elfrink filed a complaint against Bibi and Raja for forcible entry and detainer to remove them from the home. Bibi moved out of her home but filed a counterclaim for usury, quiet title and possession, and surplus proceeds from the foreclosure sale. Raja confessed judgment to his removal from the home. As the lawsuit proceeded, IndyMac initiated a foreclosure on its senior deed of trust and Elfrink bought the house for a second time at IndyMac's foreclosure sale. The superior court ultimately denied Bibi's usury claim, determining that Bibi had no standing, her claim was time barred, and in any event, the loan did not violate Alaska's usury statute because the funding fee was not interest and the usury statute did not apply once the loan's principal rose over $25,000.[1] The superior court also denied Bibi's claim for title, ruling that the foreclosure statutes gave Elfrink clear title.

Bibi appeals. We hold that (1) Bibi has standing; (2) it was error for the superior court to deny Bibi's usury claim because the funding fee was disguised interest and violated the usury statute, which applied to at least the initial period of the loan's life; and (3) the superior court correctly denied Bibi's claim for title and possession of her prior home because IndyMac's foreclosure extinguished her claim to the property.

---

[1]      AS 45.45.010(b) provides that "[a] contract or loan commitment in which the principal amount exceeds $25,000 is exempt from the [interest cap]."

## II. FACTS AND PROCEEDINGS

Mariam Bibi married Javed Raja in Pakistan. The couple moved to Alaska and had two children. They eventually bought a house in Anchorage in August 2006. They financed the purchase of their home with two promissory notes to IndyMac for $216,000 and $54,000. The notes were secured by first and second deeds of trust on the couple's home. Approximately seven months after they purchased their home, the couple's pizza business, Pizza Omega and Luigi's Pizza, were struggling. They needed money, and Raja went to Kevin Elfrink for help. Elfrink was a real estate broker who had met Raja briefly when Elfrink was selling property near the couple's pizza business.

Elfrink started making loans in the 1990s and did a few per year, borrowing money against his credit cards to finance them. Elfrink met with Raja and Bibi and they executed a promissory note in the amount of $14,597, dated March 19, 2007, to be paid back with 10% interest by March 15, 2009. But Raja and Bibi only received $10,597 at the time: $9,950 plus money to pay for the $647 in closing costs. The extra $4,000 Raja and Bibi were obligated to pay back was a "funding fee" Elfrink charged. Elfrink testified that the fee was to compensate him for educating himself about the pizza businesses, inventorying their equipment, making calls, and generally ensuring that he was making a sound loan; he also testified that he only charges the fee when he decides to extend a loan, not when he declines. The loan was secured by a security agreement on the pizza businesses, as well as a third deed of trust on Bibi and Raja's home. The deed of trust contained language stating it was for the purpose of securing "[p]ayment of the indebtedness evidenced by the promissory note . . . including all renewals, extensions or modifications thereto."

The loan was escrowed at First National Bank Alaska (FNBA). Over the next six years the couple made irregular payments and the account balance was increased three times through amendments to the escrow instructions, though Bibi claims these

increases occurred without her knowledge. In September 2007 Raja and Elfrink signed an amendment to the escrow instructions increasing the account balance by $7,061. The amendment was not signed by Bibi. In February 2008 Raja and Elfrink increased the account balance a second time by $4,532.90 through an amendment to the escrow instructions. Again, Bibi did not sign the amendment. These two amendments together brought the account balance up to $23,467.51.

Meanwhile in May 2007, Raja had hired Elfrink to sell Pizza Omega for $169,000 and signed a listing with a 10% commission. The pizza parlor later sold for about $90,000, and for the commission Raja signed an escrow instruction form in March 2008 making a third and final increase of $12,153.49 to the loan balance. Bibi's signature is on this amendment form, but she testified that she did not sign the form, and Raja testified he did not sign for her. Bibi testified that she knew nothing about these three balance increases until her attorney sent her documents obtained from Elfrink through discovery shortly before trial.

With the loan increase in March 2008 the account balance rose to $35,621. The interest rate was increased at that time to 12%, the maturity date was extended by nine years, monthly payments were lowered to $500 per month, and Elfrink waived the existing delinquency. Between May and December 2008 Bibi and Raja made eight monthly payments of $500. In 2009 they made another five monthly payments of $500. In 2010 they made three payments totaling $1,300. Bibi and Raja's last two payments on the debt were each for $500, one in 2011 and one in 2012. In addition, Bibi claimed a $500 payment was made in June 2013, and Raja testified to making a $2,500 payment outside of the FNBA escrow account sometime after mid-2013.

In June 2013 Elfrink closed the escrow account. FNBA calculated that interest had been paid only through July 2009 and that the principal balance was $35,275.72. All in all, Raja and Bibi had paid Elfrink $13,419.32 or $13,919.32 through

the escrow account, depending on whether they are credited with the final June 2013 payment of $500.

Elfrink commenced foreclosure proceedings in August 2013 and notice of default was sent to Raja and Bibi. Alaska Trustee, LLC conducted a trustee's sale in November 2013. Based on audit figures from FNBA, the trustee calculated the amount due under the deed of trust to be $56,629.65. This was the amount necessary to cover $35,275.72 in unpaid principal, $18,486.41 in interest accruing since July 2009 — the date Bibi and Raja had stopped paying on the interest — plus escrow fees, late fees, and fees charged by the trustee for conducting the foreclosure sale. Elfrink purchased the property at the foreclosure sale by offering this amount as an offset bid.[2] He was not required to pay any cash because he was entitled to the amount he bid as the beneficiary of the deed of trust.[3] Alaska Trustee issued a trustee's deed to Elfrink that was recorded in Anchorage in February 2014.

While Elfrink was preparing to foreclose, Bibi filed for divorce. By the time the superior court presiding over the divorce divided Bibi and Raja's marital assets, Elfrink had already conducted his foreclosure sale and recorded his trustee's deed. In March 2014 the superior court decided not to award the couple's home to either party in the divorce because it had been lost through foreclosure.

That same month Elfrink served Bibi and Raja with a notice to surrender possession of the premises. In April he filed a complaint for forcible entry and detainer,[4]

---

[2]     AS 34.20.080(b).

[3]     AS 34.20.080(f)(1).

[4]     "A suit for forcible detainer under Alaska statutes substitutes the authority of the courts for private force to compel a citizen wrongfully in possession of real
(continued...)

seeking possession of the property. A few days later, Bibi and her children removed most of their personal property. They left to visit Pakistan and Elfrink took possession. That same month Bibi filed counterclaims for usury, quiet title and possession, and surplus proceeds from the foreclosure sale; her attorney subsequently recorded a lis pendens against the property. For his part, Raja confessed judgment to his removal from the property.

While the lawsuit proceeded, IndyMac initiated foreclosure proceedings on its first deed of trust. The foreclosure sale was held in March 2015. Elfrink made the highest bid and bought the property a second time, paying $240,967.18. A trustee's deed conveying title to the property was recorded in April.

The next month, a three-day non-jury trial was held before Superior Court Judge Gregory Miller, after which the court entered findings of facts on the record. The court found for Elfrink on his claim for title and possession and denied all of Bibi's counterclaims. Final judgment for quiet title, possession, and expungement of lis pendens was entered in August 2015. Bibi appeals.

## III.   STANDARD OF REVIEW

"Whether a party has standing to sue is a question of law that we review de novo."[5] Whether a fee is to be treated as an interest charge in computing an effective interest rate for purposes of Alaska's usury statute depends on a set of factual questions.[6]

---

[4]   (...continued)
property to surrender it to another with a superior claim." *Modrok v. Marshall*, 523 P.2d 172, 173-74 (Alaska 1974) (footnote omitted); *see also* AS 09.45.070; AS 34.20.090(b).

[5]   *Keller v. French*, 205 P.3d 299, 302 (Alaska 2009).

[6]   *See Fikes v. First Fed. Sav. & Loan Ass'n of Anchorage*, 533 P.2d 251, 265 (Alaska 1975).

"A factual finding will be deemed clearly erroneous only if it leaves us 'with a definite and firm conviction on the entire record that a mistake has been made.' "[7] But we review a superior court's application of the usury statute to these facts,[8] as well as whether the superior court applied the correct legal standard, de novo.[9] "We review the interpretation of a statute de novo, adopting the rule of law most persuasive in light of precedent, reason, and policy."[10]

The interpretation of contractual language is a question of law that we review de novo, but determining the intent of the parties when entering a contract is a question of fact and we therefore review it for clear error.[11]

The application of Alaska foreclosure statutes is a question of law, and we apply our independent judgment in reviewing such decisions.[12]

IV. DISCUSSION

A. It Was Error To Deny Bibi's Usury Counterclaim.

Alaska's general usury statute applies to loans of $25,000 or less.[13]

---

[7]     *Smith v. Weekley*, 73 P.3d 1219, 1222 (Alaska 2003) (quoting *Duffus v. Duffus*, 932 P.2d 777, 779 (Alaska 1997)).

[8]     *See Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005). This particular standard of review is the subject of debate between the parties and is addressed in section IV.A.2 of this opinion.

[9]     *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011).

[10]     *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118 (Alaska 2009) (citing *Alaskans for Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004)).

[11]     *Rockstad*, 113 P.3d at 1219.

[12]     *Baskurt v. Beal*, 101 P.3d 1041, 1043-44 (Alaska 2004).

[13]     AS 45.45.010(b).

The statute allows a borrower who has paid usurious interest to recover double the amount of interest she pays in excess of the statute's cap,[14] but the borrower's total payments have to exceed the loan principal plus legal interest before she can recover.[15]

Bibi argues she is entitled to recover under the usury statute. First, she argues that Elfrink's original loan was usurious because (1) when one treats the funding fee as disguised interest its initial interest rate exceeded the usury statute's cap and (2) the third loan modification's interest rate of 12% violated the usury statute on its face. Second, she argues that the three modifications to the original loan were each separate loans, so every loan was under $25,000 and thus subject to the interest cap. Third, she argues that adding the escrow payments and the proceeds from Elfrink's foreclosure sale, she paid the principal amount plus interest — both usurious and legal — on each loan, and at least one of these payments — the foreclosure sale proceeds — was within the statute of limitations. Accordingly, Bibi contends she satisfies the requirements for recovery under the usury statute and should prevail on her claim.

While we do not agree with all of Bibi's arguments, we conclude that Bibi is entitled to recover under the usury statute based on the following: (1) it was error to conclude that Bibi had no standing to bring her usury claim; (2) it was error to conclude the funding fee was not disguised interest; (3) the superior court correctly determined that the usury statute's cap on interest did not apply to most of the loan period, but it did apply before the loan's balance exceeded $25,000; (4) a borrower must make payments that exceed a usurious loan's principal plus lawful interest before she can recover under the usury statute; (5) it was error to conclude foreclosure sale proceeds do not constitute

---

[14]     AS 45.45.030.

[15]     *McGalliard v. Liberty Leasing Co. of Alaska*, 534 P.2d 528, 533 (Alaska 1975), *overruled on other grounds by W. Enters., Inc. v. Arctic Office Machs., Inc.*, 667 P.2d 1232 (Alaska 1983).

a payment for purposes of the usury statute; and (6) in light of the foreclosure sale it was error to conclude that Bibi's usury claim was time barred. We hold that Bibi may recover under the usury statute, and we provide instructions to guide the superior court in calculating her award on remand.

> **1.     It was error to conclude that Bibi lacked standing to bring her usury claim.**

> **a.     Bibi has standing.**

The superior court ruled that Bibi had no standing to bring her action. It reasoned that because the loan from Elfrink was taken out to support Bibi and Raja's pizza business, and the pizza business was awarded to Raja in the couple's divorce case, Bibi had no standing to bring claims that derived from the loan. Elfrink endorses this reasoning. He argues that Bibi lacks the adversity of interest required for standing and that any usury claim that may have existed belonged to Raja, who confessed judgment.

Bibi responds in her reply brief that she has standing because she was an obligor on Elfrink's original loan, the superior court found that she ratified three additional debts to Elfrink, and she and her ex-husband had record title to the house on which Elfrink foreclosed, among other reasons. She therefore argues she has "sufficient stake in the house and related debts to make her a proper party to litigate issues relating to them."

Standing is a "rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions."[16] "The fundamental question raised by an objection to standing is whether the litigant is a proper party to

---

[16]     *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1034 (Alaska 2004) (quoting *Trs. for Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987)).

seek adjudication of a particular issue."[17] "[A] basic requirement of standing is adversity of interests."[18] One way to satisfy the adversity of interests requirement is to "have a 'sufficient personal stake' in the outcome of a controversy and an 'interest which is adversely affected by the complained-of-conduct.' "[19]

Bibi has standing to sue for usury. Elfrink foreclosed on Bibi's house to satisfy debts arising from allegedly usurious loans pursuant to agreements Bibi signed or later ratified. Bibi also made payments, along with her ex-husband, toward those allegedly usurious loans. She stands to either permanently lose or regain payments she made on allegedly usurious interest. She therefore has a "sufficient personal stake" in the outcome of this controversy,[20] and her interests have been adversely affected by Elfrink's allegedly unlawful and "complained-of-conduct."[21] The fact that the original loan was intended to support and was secured in part by a pizza business that Bibi no longer owns is irrelevant considering both that she paid on the debt and her home was sold to satisfy the debt.

### b.     Bibi did not waive her standing argument.

Elfrink additionally argues that because Bibi failed to challenge the superior court's standing decision in her opening brief or list it in her statement of points on

---

[17]     *Law Project for Psychiatric Rights, Inc. v. State*, 239 P.3d 1252, 1255 (Alaska 2010) (citing *Trs. for Alaska*, 736 P.2d at 327).

[18]     *Id.* (citing *Trs. for Alaska*, 736 P.2d at 327).

[19]     (quoting *Ruckle*, 85 P.3d at 1040; then quoting *Alaskans for a Common Language, Inc. v. Kritz*, 3 P.3d 906, 915 (Alaska 2000)). *Keller v. French*, 205 P.3d 299, 304 (Alaska 2009) (footnote omitted).

[20]     *Id.* (quoting *Ruckle*, 85 P.3d at 1040).

[21]     *Id.* (quoting *Alaskans for a Common Language, Inc.*, 3 P.3d at 915).

appeal, she waived the argument. Normally, her failure to list standing in her points on appeal would constitute abandonment,[22] her failure to argue standing in her opening brief would result in waiver,[23] and her discussion of standing in her reply brief would not resuscitate the issue.[24] But we have occasionally chosen to review issues sua sponte that were not raised on appeal,[25] and we have at times made an exception to the general rule that an issue omitted from an appellant's statement of points on appeal will not be considered. For example, in *Mullen v. Christiansen* we excused the omission of an issue from the party's points on appeal because the issue was raised at the trial level, was adequately briefed, and opposing counsel was apprised of it.[26] As with the issue in *Mullen*, standing was raised at trial, was adequately briefed in Bibi's reply, and Elfrink, as the party arguing that Bibi lacks standing on appeal, is well apprised of the issue.[27] Further, Bibi listed the usury statute on appeal and made arguments about the usury

---

[22]     *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 599 (Alaska 2012).

[23]     *Hymes v. DeRamus*, 222 P.3d 874, 887 (Alaska 2010).

[24]     *Oels*, 279 P.3d at 599.

[25]     *Keturi v. Keturi*, 84 P.3d 408, 415 n.16 (Alaska 2004) (explaining that the court had raised issue sua sponte at oral argument and allowed counsel to provide written references to the record to support finding despite recognizing that party failed to raise the "issue either in his objections [at trial] or in his appeal," and stating that this court does not usually "review issues not previously raised"). *See McCarthy v. McCarthy*, 753 P.2d 137, 140 (Alaska 1988) (Compton, J., dissenting) ("I note first that the correctness of this jury instruction is not an issue in this appeal. The court sua sponte has decided to review this instruction.").

[26]     642 P.2d 1345, 1350 (Alaska 1982) (citing *Hootch v. Alaska State-Operated Sch. Sys.*, 536 P.2d 793, 808 n.58 (Alaska 1975)).

[27]     *See id.*

statute in her opening brief; standing must necessarily be addressed before the court addresses substantive issues. In this context, we choose to review the superior court's conclusion and hold that it was error.

### 2. It was error to conclude that Elfrink's funding fee was not interest.

In March 2007, at the time of Elfrink's initial loan to Bibi and Raja, AS 45.45.010(b) established the maximum allowable interest rate for loans under $25,000 at 11.25 %.[28] Under AS 45.45.020, "[a] person may not, directly or indirectly, receive in money, goods, or things in action, or in any other manner, a greater sum or value for the loan or use of money . . . than is prescribed in AS 45.45.010."

The superior court found that Elfrink's original loan to Bibi and Raja was not usurious because the additional $4,000 fee Bibi was obligated to pay over the life of the loan was a "service fee or funding fee" rather than disguised interest. It based its decision on the fact that Elfrink told the couple that the fee was to pay for the work necessary to make sure the loan was sound and that both parties testified they had a conversation to this effect. The court also relied on an escrow instructions addendum signed by Bibi stating that "the funding fee contained on the closing statement is to be considered a service fee and is not to be considered interest."

---

[28] During the relevant period in this dispute, former AS 45.45.010(b) (2010) provided that for loans under $25,000, interest may not "be charged by express agreement of the parties in a contract or loan commitment that is more than five percentage points above the annual rate charged member banks for advances by the 12th Federal Reserve District on the day on which the contract or loan commitment is made." The federal reserve rate was 6.25% when Elfrink made the loan to Bibi and Raja, putting the maximum allowable interest rate at 11.25%. FEDERAL RESERVE BANK OF SAN FRANCISCO, DISCOUNT RATE, http://www.frbsf.org/banking/discount-window/discount-rate/#2006 (last visited May 30, 2017).

Bibi argues Elfrink's funding fee is simply interest in disguise. While she concedes that the interest rate on the face of the deed of trust promissory note was 10%, she argues that when one looks at the underlying transaction, the interest rate was actually much higher. Her math is based on a principal of $10,597, the amount of money Bibi and Raja actually received from Elfrink, rather than $14,597, the amount received plus the $4,000 funding fee. Bibi argues that because she and Raja received $10,597 and were obligated to pay back $14,597 plus 10% interest through 24 monthly payments of $673.58, she paid over $16,000 ($673.58 x 24) for a $10,597 loan, which she argues yields an effective interest rate far exceeding 11.25%, the maximum allowable interest rate at the time.[29]

Bibi contends that the escrow instructions addendum stating "the funding fee on the closing statement is to be considered a service fee and is not to be considered interest" merely signals that Elfrink knew he had a usury problem, noting that we have previously explained that "[i]n usurious transactions the parties are usually trying to disguise what they have done"[30] and that "[a] court must look squarely at the real nature of the transaction."[31] Bibi argues that regardless of the fee's name, Elfrink's loan to Bibi and Raja violated the usury statute because Elfrink received almost 45% interest, an amount above the allowable maximum, "for the loan or use of money."[32] Bibi also argues that we should review the funding fee issue in this case de novo because she is challenging the superior court's application of law — AS 45.45.020 — to facts as the superior court found them.

---

[29] Former AS 45.45.010(b) (2010).

[30] *Metcalf v. Bartrand*, 491 P.2d 747, 750 (Alaska 1971).

[31] *Id.* (quoting *Wilcox v. Moore*, 93 N.W.2d 288, 291 (Mich. 1958)).

[32] AS 45.45.020.

Elfrink, on the other hand, characterizes the funding fee issue as a question of fact and argues that we should give deference to the superior court's factual finding that the fee was not interest, but rather an earned service fee. In support of this argument he, like Bibi, cites our previous statement that "[a] court must look squarely at the real nature of the transaction,"[33] as well as a Texas case holding that the question whether a charge is merely a device to conceal usury is a question of fact.[34] From this starting point, Elfrink enumerates the various components of the record that provide support for the superior court's conclusion. They include Elfrink's testimony about the various tasks he performed to ensure the loan was sound before making it, the court's finding that Elfrink's testimony was credible on this point, and the loan documents stating that the fee was not interest. Elfrink also suggests that the court's view of Raja's and Bibi's credibility supports the court's finding that the fee was not interest.

Our precedent demonstrates that determining whether a fee is considered interest under Alaska's usury laws involves an application of law to fact that we review de novo,[35] though factual questions underlie the determination.[36] We have previously identified the set of factual questions germane to this determination. In *Fikes v. First Federal Savings & Loan Association of Anchorage* we considered whether a loan fee of one-and-a-half percent was actually interest for purposes of a previous version of AS 45.45.010(b) that, like the version applicable here, prohibited interest rates exceeding

---

[33]    *Metcalf*, 491 P.2d at 750 (quoting *Wilcox*, 93 N.W.2d at 291).

[34]    *Gonzales Cty. Sav. & Loan Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex. 1976).

[35]    *See Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005).

[36]    *See Fikes v. First Fed. Sav. & Loan Ass'n of Anchorage*, 533 P.2d 251, 265 (Alaska 1975).

the federal lending rate plus a fixed percentage.[37] The superior court had found that the one-and-a-half percent service charge did not constitute interest within the meaning of any relevant usury statute.[38] We concluded "that the usury issue [was] incapable of resolution without a more adequate factual basis"[39] and remanded, stating:

> Among the factual questions which we think are germane are the following: what charges, if any, the loan fee is designed to defray; whether the loan fee is a one-time charge or assessed throughout the life of the loan; whether the amount of the loan fee is dependent on the amount of the loan or the risk of the enterprise being financed; whether the loan fee and interest rate are charged on the entire committed amount no matter what the size and period of the balances outstanding; and what difference, if any, there is between [the bank's] internal accounting treatment of the loan fee and that of interest. The superior court should consider these matters in determining, in the first instance, whether there has been usury.[40]

We also explained that "[i]f the loan fee is either substantially similar to interest in all material respects or unreasonably large, the loan fee, or a portion thereof, could well be treated as an interest charge in computing the effective interest rate for purposes of AS 45.45.010(b)."[41]

Later in *Metcalf v. Bartrand* we reviewed a superior court's finding that

---

[37]     533 P.2d at 263; former AS 45.45.010 (1970).

[38]     *Fikes*, 533 P.2d at 264.

[39]     *Id.*

[40]     *Id.* at 265 (footnote omitted).

[41]     *Id.* (footnotes omitted).

a set of real estate transactions constituted a loan with usurious interest.[42] We concluded that in "[l]ooking not to the form but to the substance of the transactions, there [could] be little doubt but that they [came] within the broad terms of the Alaska usury law."[43]

These decisions establish two principles. First, while a loan transaction may facially comply with the cap on interest rates found in AS 45.45.010, it may nevertheless be charging an effective interest rate in violation of that cap because of disguised interest.[44] Second, whether this is the case requires a court to determine if, given the facts regarding the substance of a given transaction, the transaction "come[s] within the broad terms of the Alaska usury law"[45] or, stated alternatively, whether the service fee is "treated as an interest charge in computing the effective interest rate for purposes of AS 45.45.010(b)."[46] This determination is an application of law to fact.

Here the superior court failed to consider some of the "factual questions . . . germane" to the funding fee issue we identified in *Fikes*.[47] We find two questions particularly relevant to the issue before us. First, the court did not consider whether the

---

[42]   491 P.2d 747, 750 (Alaska 1971).

[43]   *Id.* at 751.

[44]   *See also Crissey v. Alaska USA Fed. Credit Union*, 811 P.2d 1057, 1061 (Alaska 1991) ("[I]n *Fikes* we held that certain charges assessed against a borrower, such as 'service fees,' might qualify as interest for purposes of a usury analysis." (citing *Fikes*, 533 P.3d at 265 & n.27)).

[45]   *Metcalf*, 491 P.2d at 751.

[46]   *Fikes*, 533 P.2d at 265.

[47]   *Id.*

-16-                                                      7202

funding fee was "a one-time charge or assessed throughout the life of the loan."[48] The fee was rolled into the rest of the loan for payment over time rather than charged and paid at the outset. Thus it was assessed throughout the life of the loan, which favors concluding that it was interest.[49] Second, the court did not consider whether the funding fee was unreasonably large.[50] Elfrink claims his work investigating the pizza business assets, meeting with Bibi and Raja, and making calls was worth $4,000, all to ensure that a loan for around $10,000 was sound. But the funding fee was over 37% of the value of the loan Bibi and Raja received. In comparison, the loan fee in *Fikes* was only one-and-a-half percent, and we still required further inquiry into whether it was a vehicle for disguised interest.[51] This establishes that the funding fee was unreasonably large. Lastly, given the language of AS 45.45.020, which defines interest as value "for the loan or use of money," Elfrink's own testimony that his funding fee is charged only if the loan is made, rather than regardless of whether it is made, places the funding fee squarely "within the broad terms of the Alaska usury law"[52] because it is charged "for the loan or

---

[48]     *Id.*

[49]     *Id.* at 265 n.27 ("[I]f the loan fee is assessed throughout the life of the loan, the fee would more closely resemble interest.").

[50]     *Id.* at 265; *see also Altherr v. Wilshire Mortg. Corp.*, 448 P.2d 859, 863 (Ariz. 1968), *cited in Fikes*, 533 P.2d at 265 ("[I]f such a charge is unreasonable, and the borrower is forced to accept the lender's services at an unreasonable rate in order to get the loan, then it may be said, fairly, that the excess of the fees over what would be reasonable, is a charge for the loan, and hence is interest.").

[51]     *Fikes*, 533 P.2d at 264.

[52]     *Metcalf v. Bartrand*, 491 P.2d 747, 751 (Alaska 1971).

use of money," not for services.[53]

While Elfrink argues that we should give the superior court's determination deference because it is consistent with how the loan documents characterized the fee and the court was in the best position to evaluate the credibility of the parties on this point, these arguments only go so far.  Under *Fikes* and *Metcalf*, how a fee is characterized in a loan document is but one factor in determining whether a fee constitutes usurious interest, especially considering that parties to a usurious loan often attempt to disguise it.[54]  And while the superior court gave considerable weight to Elfrink's testimony regarding the work he did to justify the funding fee, the court failed to consider the two relevant *Fikes* factors discussed above that are largely divorced from the credibility of the parties, factors that we believe would have led the court to apply the usury statute correctly.[55]  In light of this analysis, we hold that Elfrink's funding fee was disguised interest for purposes of the usury statute and it was error to conclude otherwise.

When this disguised interest is taken into account, it is clear that Elfrink's initial loan to Bibi was well above the maximum allowable interest rate of 11.25% at the time; the disguised interest alone was over 37% of the loan's principal.[56]  We conclude that Elfrink's initial loan to Bibi was usurious.

> **3.    The superior court did not err in finding that the loan balance increases were modifications to a single loan that rendered the usury statute inapplicable once the loan principal rose over $25,000.**

The superior court found that the final interest rate of 12% established by

---

[53]    AS 45.45.020.

[54]    *See Metcalf*, 491 P.2d at 750.

[55]    *See Fikes*, 533 P.2d at 265.

[56]    Former AS 45.45.010(b) (2010).

the March 2008 modification, while above the statutory maximum for loans under $25,000 pursuant to AS 45.45.010, was not usurious because modifications to the original loan had brought the loan principal over $25,000 and the usury statute no longer applied.[57]

Bibi argues that each modification constituted a separate loan under $25,000 subject to the usury statute's cap. According to Bibi, the four separate transactions included the original loan in March 2007, a second loan in September 2007, a third loan in February 2008, and the commission claimed in March 2008. Bibi also argues that each transaction was a separate loan not only because each was separate in time, but also because each was documented separately — the original loan with a promissory note and other documents; the second and third loans with separate FNBA forms for each; and the fourth (commission) transaction with a real estate listing.

Bibi argues that each loan was usurious when viewed separately. Specifically, she argues that the original March 2007 loan was usurious because the funding fee raised its effective interest rate to near 45% — and was at least usurious by March 2008 when Elfrink increased the stated interest rate from 10% to 12% because AS 45.45.010 set the maximum rate at 7.5% at that time. She argues that the second and third loans were not usurious when made but also became usurious when Elfrink increased the interest rate to 12% in March 2008. Lastly, she asserts that the real estate sales commission Elfrink charged in March 2008 bore interest at a usurious 12% from the beginning.

Bibi argues that our decision in *Rockstad v. Erikson* supports her view that

---

[57]     *See* former AS 45.45.010 (2010).

each balance increase was in fact a separate loan.[58]  In *Rockstad* we applied AS 45.45.010 and held that one note with two simultaneous disbursements each below $25,000 was just one loan in excess of $25,000.[59]  While this tends to undermine Bibi's position, she insists that in *Rockstad* we also suggested that when evidence demonstrates that there are really two different loans, "such a reading would necessarily imply that the note constitutes an unlawfully usurious contract."[60]  But while *Rockstad* did contemplate a scenario in which sufficient evidence can demonstrate the existence of multiple usurious loans rather than a single larger loan with a legal interest rate, we found no such evidence in that case.[61]  In *Rockstad* we relied in part on the language of the note, which spoke of a singular loan for $26,000, to conclude that there was only one non-usurious loan.[62]

Elfrink argues that the superior court's finding of one loan modified three times is a factual finding that is supported by the record and thus not clearly erroneous. We agree.  "Although the interpretation of contractual language is a question of law and reviewed de novo, '[t]he intent of the parties when entering a contract is a question of fact and is thus reviewed under the clearly erroneous standard.' "[63]  "[A]nd we give 'due

---

[58]    113 P.3d 1215 (Alaska 2005).

[59]    *Id.* at 1221-22.

[60]    *Id.* at 1222.

[61]    *Id.*

[62]    *Id.*

[63]    *Id.* at 1219 (alteration in original) (quoting *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 712 (Alaska 2003)).

regard to the trial court's opportunity to evaluate the credibility of witnesses.' "[64] Relying in part on its view of the credibility of the parties, the superior court found that Bibi signed or ratified all of the escrow amendments — a finding Bibi does not appeal.[65] Based on this finding and the testimony of the parties, the superior court found that the amendments to the escrow instructions evidenced the intent of the parties to modify the principal amount of the original loan — a factual determination that we will not overturn unless clearly erroneous.[66]

While the escrow amendments did not reference the collateral or the original loan, each one updated the loan balance by stating that "the principal is" an amount reflecting the previous principal plus the present increase. In addition, FNBA sent letters to Raja and Bibi to confirm these increases, and the superior court did not find Raja's assertions that he did not receive them credible. As Elfrink notes, the borrowers received only one substitute 1098 tax form from the bank for 2007-2009 and only one year-end statement for 2010-2012, suggesting the balance increases were modifications to one loan. Unlike the actual and hypothetical scenarios we discussed in *Rockstad*, the evidence here supports the superior court's finding that the various increases to the original loan amount were intended as modifications to the original

---

[64]     *Allen v. Vaughn*, 161 P.3d 1209, 1212 (Alaska 2007) (quoting *Horton v. Hansen*, 722 P.2d 211, 215 (Alaska 1986)).

[65]     The superior court found that Bibi's signature on the third amendment was her signature, that her assertion that she did not sign the document was not credible, and that through her signature of the third modification, Bibi "thereby ratif[ed] . . . the first two [escrow] modifications." While Bibi criticizes these factual findings in passing, she states in her briefs that she does not challenge them on appeal, and we express no opinion with regard to them here.

[66]     *Rockstad*, 113 P.3d at 1219.

principal rather than new loans.[67]  Therefore, the superior court's finding was not clearly erroneous.[68]  Consequently, when the March 2008 modification brought the single loan's principal over $25,000, the interest rate cap no longer applied.[69]

### 4. Bibi's payments must exceed the loan's principal amount plus lawful interest before she can recover under AS 45.45.030.

The parties next dispute whether Alaska law requires that a borrower's payments exceed a loan's principal amount plus lawful interest before she can recover under the usury statute.  We reaffirm that it does.  Alaska Statute 45.45.030 provides that "[i]f interest greater than that prescribed in AS 45.45.010 and 45.45.020 is received or collected, the person paying it may, by action brought within two years after the payment, recover from the person receiving the payment double the amount of the interest received or collected."

Elfrink argues that for Bibi to succeed on her usury claim, she had the burden of proving that he "received or collected" a payment in excess of the principal amount plus lawful interest.  In support, he cites *Werner v. Lorentzen*, a 1907 federal Alaska case interpreting the predecessor to AS 45.45.030 as requiring that "before an action may be maintained under this provision of the Alaska Code, the debtor must have

---

[67]  *Id.* at 1222.

[68]  Bibi also argues that there is no paperwork documenting that the three loan modifications were secured by the collateral that Bibi and Raja gave Elfrink for the original loan, namely her house and the pizza business.  But the deed of trust offered as collateral to the original loan states that it is for the purpose of securing "the principal sum of $14,597, . . . including all renewals, extensions or modifications thereto."  Because the escrow amendments reflect an intent to modify the principal of the original loan, and the deed of trust's plain language secures the principal amount and all modifications thereto, it follows that Bibi's former home secured the original loan and all subsequent modifications.

[69]  *See* former AS 45.45.010(b) (2010).

actually paid an amount in excess of the principal and legal interest."[70]  Bibi argues that we rejected this holding in 1975 with our decision in *McGalliard v. Liberty Leasing Company of Alaska*.[71]  She misunderstands *McGalliard*.

There are two separate claims available under the usury statute.  The first, under AS 45.45.030, is an action to recover "double the amount of the interest" paid.  The second, under AS 45.45.040, is typically brought by a creditor to recover the balance on a contract that a court finds to be usurious.  The creditor recoups his principal but forfeits the entire interest on the debt.[72]  In *McGalliard* we explained the different requirements for each:

> As early as 1907 the Alaska courts acknowledged that [AS 45.45.030] permits a debtor to recover under this provision only when he has paid a sum greater [than] the principal plus lawful interest.  Since the total sum paid to [plaintiff] does not exceed the principal borrowed plus lawful interest, the requirements for recovery under AS 45.45.030 have not been met in this case.  AS 45.45.040 contains no such limitation.

---

[70]  3 Alaska 275, 279 (D. Alaska 1907).  The *Werner* decision relied on the Supreme Court's decision in *McBroom v. Scottish Mortg. & Land Inv. Co. of New Mexico* where it explained that "interest cannot be said to have been collected or received in excess of what may be lawfully collected and received until the lender has, in fact, after giving credit for all payments, collected or received more than the sum loaned, with legal interest."  153 U.S. 318, 328 (1894).

[71]  534 P.2d 528, 533 (Alaska 1975), *overruled on other grounds by W. Enters., Inc. v. Arctic Office Machs., Inc.*, 667 P.2d 1232 (Alaska 1983).

[72]  AS 45.45.040.

> Under AS 45.45.040 the entire interest is forfeited and the court shall give judgment for the plaintiff for the amount due, without interest, and in favor of the defendants for costs of the action.[73]

Bibi focuses on the portion of this paragraph explaining AS 45.45.040, but that provision does not govern the issue before us today. While AS 45.45.040 worked a forfeiture of the entire interest in *McGalliard* because the creditor-plaintiff brought suit against a borrower to recover the balance of payments due under a usurious lease agreement,[74] the question Bibi presents on appeal is whether the superior court "err[ed] by failing to make a lender pay back twice the usurious interest that he received." And in her prayer for relief, Bibi requests double the usurious interest paid. An "action for recovery of double amount of usurious interest paid" under AS 45.45.030 is thus the vehicle for recovering the payments Bibi seeks. As we made clear in *McGalliard*, a debtor may only recover under AS 45.45.030 after she has paid a sum greater than the principal plus lawful interest.[75] As the next section will show, Bibi has satisfied this requirement and will therefore be able to recover what she has requested on appeal — double the amount of usurious interest paid.

**5.      The value generated by Elfrink's foreclosure sale constituted a payment under AS 45.45.030 through which Bibi paid the entire loan principal plus lawful and usurious interest.**

The parties dispute the exact amounts Bibi paid on the loan and the amount of the principal. But regardless of the numbers chosen, Bibi did not pay a sum that exceeded the principal, let alone legal interest, unless the value generated by the

---

[73]      *McGalliard*, 534 P.2d at 533 (footnote omitted).

[74]      *Id.* at 529, 533.

[75]      *Id.*

foreclosure sale of her home is treated as a payment under the usury statute.[76]  On the other hand, if the monetary value Elfrink received from his foreclosure sale of Bibi's home to satisfy the debt is considered a payment on the loan, then Bibi did pay an amount above the principal amount plus legal interest and remains eligible for recovery under the usury statute.[77]

The superior court implicitly concluded that foreclosing on collateral to enforce a secured debt does not count for usury purposes.  This finding was implicit in the court's ruling that Bibi's usury claim was time barred because Bibi brought her claim just a few months after Elfrink's foreclosure.  Bibi argues that foreclosure on collateral constitutes payment on the underlying secured debt for purposes of the usury statute.  After all, she argues, a lender requires collateral in order to have an alternate source of payment if the borrower defaults.

We agree.  Alaska Trustee sold Bibi's house to Elfrink, and according to the Trustee's Deed "[p]roceeds from the sale [were] applied to sums due under the Deed of Trust executed by Javed Raja & Mariam [Bibi], husband and wife, Trustor(s), and Kevin J. Elfrink, Beneficiary."  These proceeds from sale are a payment on a debt capable of triggering recovery under the usury statute.  This is especially clear here where the beneficiary purchases the property and extinguishes the debt by making an offset bid calculated to cover the loan principal, interest, and late fees.[78]

Elrink argues that an offset bid does not result in the creditor's receipt or

---

[76]  Elfrink and Bibi agree that when all of the FNBA escrow payments are added up, they equal less than $14,000.  Bibi argues for "more than $16,000" if Raja's alleged $2,500 cash payment to Elfrink outside of escrow is counted.  The parties also agree that the loan principal balance after modifications was over $34,000.

[77]  AS 45.45.030; *McGalliard*, 534 P.2d at 533.

[78]  AS 34.20.080(b), (f)(1); AS 34.20.100.

collection of any cash proceeds from the foreclosure sale and for this reason cannot constitute a payment for purposes of the usury statute. But even if we characterized what Elfrink received through his foreclosure sale as a house rather than money, both of which are conceptually plausible, the broad language of AS 45.45.020 provides that a "person may not, directly *or indirectly*, receive in . . . *any . . . manner*, a greater sum *or value* for the loan or use of money . . . than is prescribed in AS 45.45.010 - 45.45.070." (Emphasis added.) This broad language clearly encompasses an offset bid, which is a manner of receiving value, however characterized.[79]

Elfrink further argues that payment of interest under AS 45.45.030 requires a voluntary payment, not an offset bid by a secured creditor in an involuntary foreclosure on collateral. He cites but does not discuss *Henning v. Mainstreet Bank* for support.[80] *Henning* is an Eighth Circuit case interpreting the word "paid" in a contract; it is of little help in interpreting the statutory provision here.[81] In addition, Elfrink's suggestion that a payment has to be voluntary under AS 45.45.030 is unpersuasive. The usury statute provides that usurious interest cannot be received in any manner in AS 45.45.020. It would make little sense if its very next provision limited those who can recover payments on usurious interest specifically to borrowers paying cash voluntarily. We conclude that value generated by a foreclosure sale constitutes a payment for purposes

---

[79]    Elfrink also argues that to demonstrate he received cash proceeds from the foreclosure sale, Bibi needed to show that there was net equity in the property at the time of the sale and that Bibi was entitled to it. But Bibi brought a usury claim, not a claim for surplus proceeds. The issue in a usury claim is whether a creditor received usurious interest payments on a debt. AS 45.45.030. Elfrink's offset bid was calculated to cover the loan principal, interest, and late fees associated with his usurious loan to Bibi. A showing that the foreclosure sale also generated surplus proceeds is not necessary.

[80]    538 F.3d 975, 978 (8th Cir. 2008).

[81]    *Id.*

of AS 45.45.030, and it was error not to treat it as such.

### 6. It was error to conclude that Bibi's usury claim was barred by the statute of limitations set forth in AS 45.45.030.

The superior court concluded that Bibi's usury claim was barred by the two-year statute of limitations under AS 45.45.030 because the only escrow payment within the two-year limit, made in July 2012, was applied entirely to late fees, not to interest. Because we hold that foreclosure proceeds are a payment for purposes of the usury statute, and Bibi filed her usury claim only a few months after the foreclosure sale, she filed well within the two-year time limit. Her claim therefore was not time barred. Further, Bibi's cause of action for usury only arose at the point when her payments exceeded the loan principal, plus legal interest, as required by *McGalliard*.[82] Consequently, Bibi could not have brought her usury claim prior to the foreclosure sale.

### 7. Bibi is entitled to recover double the amount of usurious interest paid.

Through her payments of at least $13,419.32 to the escrow account and her additional payment of $56,629.95 from Elfrink's foreclosure sale, Bibi paid her entire loan principal plus all interest, both legal and usurious, to Elfrink. She then filed a timely usury claim. We hold that under AS 45.45.030, Bibi is entitled to double whatever portion of these payments constituted usurious interest, that is, interest above the statutory maximum at the time.[83] We provide guidance consistent with this opinion's conclusions to aid the superior court in calculating Bibi's usury award on remand.

First, to determine how much Bibi and Raja paid on the loan the superior court must decide whether to include Bibi's disputed $500 payment made in June 2013 and Raja's alleged $2,500 payment outside of escrow after mid-2013 to the loan

---

[82] 534 P.2d at 533.

[83] *See* AS 45.45.030.

payments of $13,419.32 from the escrow account. The court must then include the additional payment from Elfrink's foreclosure sale.

Second, the superior court must calculate what amount of Bibi's total payments were applied toward usurious interest generated by the original loan and the two modifications that preceded the principal's rise over $25,000 in March 2008, the point at which the usury statute ceased to apply.

Third, while the loan's post-March 2008 interest rate was lawful, the rate was applied to a principal that would not have been as large if Elfrink had charged a legal interest rate from the beginning. Thus, some of the interest generated even post-March 2008 can be attributed to the original usurious nature of the loan. Therefore, the post-March 2008 principal and interest should be adjusted to reflect what they would have been had a legal interest rate been charged pre-March 2008 to remove any effect the original usurious interest rate had on post-March 2008 payments. This may mean assuming that the maximum legal interest rate allowed before March 2008 was charged rather than the usurious one actually used, applying payments to this hypothetical interest, applying the rest to principal, and then adjusting the post-March 2008 principal and accrued interest accordingly. This will allow the superior court to award Bibi not only double whatever amount she paid on pre-March 2008 usurious interest, but also double whatever amount she paid on interest in excess of the adjusted post-March 2008 amount. Lastly, applying a legal hypothetical interest rate from the beginning may push the date at which the loan's principal would have exceeded $25,000 past March 2008, thereby extending the period to which the usury statute applied to the loan. If so, the new date should be taken into account when calculating Bibi's recovery. The superior court may in its discretion take additional evidence to assist in its calculation of Bibi's usury recovery.

Fourth, the superior court must decide whether to treat late fee payments

as interest payments for purposes of Bibi's recovery. The superior court decided that late fee payments do not count as interest payments for purposes of the statute of limitations. This question is no longer relevant. But the question whether payments made toward late fees count as interest payments does affect whether Bibi can recover them under AS 45.45.030. Bibi argues that late fee payments are included as interest payments because AS 45.45.020 does not differentiate between late fees and interest, but rather applies to all compensation "for the loan and use of money" without regard to labels.[84] Elfrink argues that most jurisdictions treat late charges as noninterest because they are not payments to secure extension of credit, "but rather are penalty payments accruing only because of action solely within the borrower's control," though he recognizes that we have not decided this issue.[85] Because the parties' discussion of this issue was limited and done solely in the context of the statute of limitations issue, we leave it to the superior court to decide in the first instance whether late fees count as interest payments when calculating Bibi's recovery on remand.[86]

Lastly, Bibi suggested at trial and on appeal that she is due surplus proceeds from the foreclosure sale. But Bibi fails to discuss how a claim for surplus proceeds interacts with her claim under the usury statute and its various provisions. Alaska Statute 34.20.080(f) requires that money left over from a foreclosure sale after paying off the beneficiary of the deed of trust being foreclosed and any subordinate interests be

---

[84]    AS 45.45.020

[85]    *See Crissey v. Alaska USA Fed. Credit Union*, 811 P.2d 1057, 1062 n.8 (Alaska 1991).

[86]    The same determination must be made on remand with respect to escrow and foreclosure sale trustee fees.

distributed to the previous homeowner.[87]  The superior court, having determined that Bibi legally owed everything she paid via the foreclosure sale, found she failed to prove that any surplus proceeds were generated by the sale or that Bibi was entitled to them if they did exist.  But we have concluded that usurious interest was charged and, therefore, that Bibi did not legally owe the entire debt paid via the foreclosure sale.  We are remanding to the superior court to determine a usury award based on this conclusion.  The superior court shall also determine on remand what surplus proceeds, if any, Bibi is due from that sale.

**B.      The Superior Court Did Not Err By Denying Bibi's Counterclaim For Clear Title And Possession And Granting Elfrink Clear Title And Possession.**

Bibi argues that Elfrink's foreclosure should be set aside and title transferred from Elfrink back to Bibi.  She argues that even though IndyMac's foreclosure sale would typically cut off the junior interest on which her claim is based,[88] we should make an exception because the purchaser at Indymac's foreclosure sale was Elfrink.  The parties also debate whether Bibi's claim for title is barred by collateral estoppel and laches and whether IndyMac is an indispensable party.  We conclude that the superior court correctly denied Bibi's claim for title and possession because the court correctly determined that IndyMac's foreclosure extinguished Bibi's claim and gave clear title to Elfrink.

The superior court concluded that under AS 34.20.080 and AS 34.20.090, Bibi's interest in her former home had been extinguished and Elfrink was entitled to title and possession.  Bibi concedes that ordinarily a properly conducted non-judicial

---

[87]      *See* AS 34.20.080(f).

[88]      AS 34.20.090; *Adams v. FedAlaska Fed. Credit Union*, 757 P.2d 1040, 1042 (Alaska 1988).

foreclosure sale extinguishes junior claims, so IndyMac's foreclosure sale based on its senior deed of trust would have normally cut off both Elfrink's and Bibi's junior interests in the property. But she argues that we should deviate from this principle here because the buyer at IndyMac's foreclosure sale was not a regular third party buyer, but rather Elfrink himself. Bibi argues that Elfrink "engineered" the foreclosure sale by collecting rent money from tenants after he took over the property instead of using it to pay IndyMac, which she refers to as "equity-skimming." She asserts that this caused IndyMac to foreclose and allowed Elfrink to bid on and buy the property a second time. Bibi argues that Elfrink took these actions "presumably so that he could make the argument that he's making here," namely that IndyMac's foreclosure extinguished any claim Bibi might have had to her prior home. While Bibi acknowledges there is no dispositive case law on this issue in Alaska, she suggests that precedent "saying that we don't allow a wrongdoer to profit from his misdeeds" supports the exception she asks us to make.[89]

Elfrink responds that Bibi's claim for title and possession is moot because IndyMac's foreclosure sale on its senior deed of trust intervened to extinguish any interest in the property held by Bibi after the Elfrink foreclosure.[90] He reasons that there

---

[89] *See, e.g.*, *In re Estate of Blodgett*, 147 P.3d 702, 705 (Alaska 2006) (recognizing the common law no-profit principle); *State Farm Mut. Auto. Ins. Co. v. Raymer*, 977 P.2d 706, 712 (1999) (recognizing the no-profit principle and discussing constructive trust as a remedy).

[90] For this proposition, Elfrink cites AS 34.20.090(a):

> The sale and conveyance transfers all title and interest that
> the party executing the deed of trust had in the property sold
> at the time of its execution, together with all title and interest
> that party may have acquired before the sale, and the party

(continued...)

is therefore "no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if [she] prevails."[91]  He further argues that "[t]he purchaser at the IndyMac foreclosure sale, whether it was Kevin Elfrink or some other third party, acquired all title and interest in the property, regardless of whether or not the earlier 2013 foreclosure sale on the Elfrink third deed of trust was void or voidable."[92]  Lastly, Elfrink takes issue with Bibi's claim that to collect rent instead of sending it to IndyMac means that Elfrink was "equity-skimming" and "engineered" the second foreclosure sale.  Elfrink asserts that he was entitled to collect rent after he acquired title until he received notice from IndyMac demanding payment of the rental income pursuant to its deed of trust, citing *Bevins v. Peoples Bank & Trust Co.* for this proposition.[93]

"Under Alaska foreclosure statutes, the trustee of a deed of trust may foreclose and sell the property which has been pledged as security for an indebtedness without first securing a decree of foreclosure from the court.  Upon selling the property the interests created subsequent to the deed, including those of junior lienholders, are cut off."[94]  In *Adams v. FedAlaska Federal Credit Union* we held that a bank lost its junior

---

[90]     (...continued)
executing the deed of trust or the heirs or assigns of that party have no right or privilege to redeem the property, unless the deed of trust so declares.

[91]     *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002) (citing *Gerstein v. Axtell*, 960 P.2d 599, 601 (Alaska 1998)).

[92]     *See Waldock & Padgett Invs. v. C.B.S. Realty*, 668 P.2d 819, 822 (Alaska 1983).

[93]     671 P.2d 875, 879 (Alaska 1983).

[94]     *Adams v. FedAlaska Fed. Credit Union*, 757 P.2d 1040, 1041-42 (Alaska 1988) (citation omitted) (first citing AS 34.20.070; then citing AS 34.20.090 and
(continued...)

security interest in property as a result of a foreclosure sale by another bank with a senior interest even though the junior bank was the purchaser at that sale.[95] We read AS 34.20.090 strictly, concluding that its language demonstrated "that upon sale by the senior lienholder, . . . the junior lienholder[] los[es] its security interest in the property" and that "[t]he statutes contain no exception to this rule when the purchaser at a sale is a junior lienholder."[96] While our strict reading was based in part on policy reasons regarding Alaska's anti-deficiency statute not applicable here, it was also based on the text of the statute, and we adopt the same interpretation in this case.[97] Any interest Elfrink acquired from his foreclosure sale on the junior deed of trust was cut off by IndyMac's foreclosure sale on its senior deed of trust, despite the fact that the purchaser at that sale was Elfrink, the junior interest holder.[98] This means that Elfrink no longer had any interest acquired under the junior deed of trust, and Bibi therefore had no claim to a non-existent interest. This conclusion is consistent with our holding in *Adams* and with the foreclosure statutes' purpose "to protect the foreclosure sale purchaser."[99]

Bibi's argument that Elfrink engineered the sale is unpersuasive. Our prior decision in *Bevins v. Peoples Bank & Trust Co.* suggests that rental income did not have to be distributed to IndyMac unless demanded, even if there was a rental income

---

[94]     (...continued)
*Waldock & Padgett Invs.*, 668 P.2d at 822-23).

[95]     *Id.* at 1041-44.

[96]     *Id.* at 1042.

[97]     *Id.* at 1042-44.

[98]     *Id*. at 1044.

[99]     *Bauman v. Day*, 892 P.2d 817, 823 n.8 (Alaska 1995).

provision in its deed of trust.[100]  Bibi has not directed us to a rental income provision, a

demand from IndyMac, or relevant case law on this issue, nor has she argued that Elfrink

was responsible for the mortgage payments to IndyMac.  In addition, while wrongful

behavior would be relevant under a no-profit principle,[101] there is little evidence of such

behavior here, apart from Bibi's passing allegation of equity skimming.[102]  Furthermore,

even if Elfrink's intent was to extinguish his junior interest by purchasing Bibi's prior

home at IndyMac's foreclosure sale and thereby eliminate Bibi's claim for title, he also

intended to resell the property and chose to risk over $240,000 to do so.  This makes him

similar to many purchasers of senior interests that the foreclosure statutes are meant to

protect.[103]  We conclude the superior court did not err by determining that Bibi's claim

to title and possession was extinguished under AS 34.20.090, and we decline to create

an exception in this context.  Because we conclude the superior court correctly denied

---

[100]     *See* 671 P.2d 875, 879 (Alaska 1983) (holding that deed of trust rent clause
allowing beneficiary to collect rents upon default to satisfy secured debt does not
automatically assign rents to beneficiary because beneficiary must take some action to
acquire possession of property or rents before rent clause becomes operative).

[101]     *See In re Estate of Blodgett*, 147 P.3d 702, 705 (Alaska 2006) (recognizing
the common law no-profit principle).

[102]     Equity skimming is a narrowly defined federal crime requiring that a deed
of trust be insured or held by a federal agency, among other elements not met here.  *See*
12 U.S.C. § 1709-2 (2012).  More generally, the term can include a number of practices.
The common theme is that "the skimmer makes promises to help the owner or investor
but does not perform . . . , leaving the owner or investor with an unpaid mortgage . . . and
facing foreclosure, while the skimmer keeps any money acquired for his own personal
use."  Brad R. Jacobsen & Michael Barnhill, *Drawing the Short Straw — Mortgage
Fraud and Straw Buyers*, 21 Utah B.J. 9, 10 (2008).  Here, Elfrink and Bibi never had
an agreement regarding mortgage payments to IndyMac after Elfrink's foreclosure sale.

[103]     *See Bauman*, 892 P.2d at 824 n.8 (noting one of the main purposes of
AS 34.20.090 is "to protect the foreclosure sale purchaser").

Bibi's claim to title and possession, we do not address Elfrink's collateral estoppel, laches or indispensable party arguments.

### C.    The Superior Court Shall Determine The Award Of Attorney's Fees And Costs On Remand.

Bibi makes a request at the final page of her brief, without argument, that we direct the superior court to award her full costs and attorney's fees, including for this appeal, under AS 45.45.040.  As discussed earlier, Bibi has brought a claim under AS 45.45.030 seeking double the amount of usurious interest paid.  Because she is not a creditor suing a borrower to enforce a usurious contract, the scenario contemplated by AS 45.45.040, any attorney's fees provision in that statute does not apply here.  The superior court awarded attorney's fees and costs to Elfrink "pursuant to the terms of the deed of trust and promissory note, and/or Alaska Civil Rule 82" after granting him forcible entry and detainer and denying Bibi's counterclaims for usury, quiet title, and surplus proceeds.  Because we reverse the court's denial of Bibi's usury counterclaim on appeal, we remand for a determination of prevailing party status and an award of attorney's fees and costs under Rule 82.

## V.    CONCLUSION

We REVERSE the superior court's denial of Bibi's counterclaim for usury, AFFIRM the superior court's denial of Bibi's counterclaim for title and possession,  its grant of forceful entry and detainer, and its expungement of the lis pendens on Elfrink's property, and REMAND for calculation of Bibi's usury award, surplus proceeds, if any, and attorney's fees and costs in a manner consistent with this opinion.