## WILCOX *v.* MOORE.

1. USURY—PURPOSE OF STATUTE.
   The purpose of the law of usury is to protect the necessitous borrower from extortion (CL 1948, § 438.52).

2. SAME—EXAMINATION OF TRANSACTION.
   The court looks at the real nature of a transaction, claimed to be usurious, not its form or color, but to the nature and substance.

3. SAME—TRANSACTION IN FORM OF PURCHASE AND SALE—LOAN WITH ILLEGAL BONUS.
   Transaction whereby plaintiff actually loaned money to defendants to enable latter to complete purchase of a home, at a substantial and illegal bonus, *held,* usurious, it being immaterial that device of purchase and sale was employed (CL 1948, § 438.52).

Appeal from Oakland; Hartrick (George B.), J. Submitted June 10, 1958. (Docket No. 52, Calendar No. 47,512). Decided December 2, 1958.

REFERENCES FOR POINTS IN HEADNOTES

[1] 55 Am Jur, Usury § 3.
[2, 3] 55 Am Jur, Usury § 14.
  Usury by charge of bonus incident to loan of money. 21 ALR 797, 53 ALR 743, 63 ALR 823, 105 ALR 795.

Bill by Libbie E. Wilcox against Young John Moore and Elfriede Ann Moore to foreclose land contract for entire unpaid balance. Defendant Young John Moore asks that contract be declared a usurious loan and that court determine amount owing thereon. Decree of foreclosure for plaintiff. Defendant appeals. Reversed and remanded.

*Donald P. Schuur* and *Patrick J. Keating,* for plaintiff.

*Donald W. Grant,* for defendant Young John Moore.

SMITH, J. The question before us is whether the described transaction is a sale of property, or a loan of money (at a usurious rate of interest), secured by what we are asked to hold is a mortgage.

Defendant Moore, and then wife Elfriede, were desirous of buying a home. One John Stoppert owned the house and lot they wanted. Through White Brothers, brokers, the Moores enterd into a written agreement for the purchase. The sale price in the preliminary agreement was $21,200. It was later "adjusted" to $20,608.39. Of this sum $100 was given by Mr. Moore to the broker as a down payment at the office when the agreement was executed. Defendant received at this time a preliminary purchase agreement. Additional payments totalling some $5,600 were eventually made by defendant. It was apparent early in the transaction, however, that financial help would ultimately be needed. After attempting to borrow from various sources defendant was recommended to Mr. Theodore Feldkamp, a contract broker. At this point the versions of the participants diverge. We will, in due course, make some comparisons between the versions submitted. Suffice, for present purposes, to state that defendant's

mission to Mr. Feldkamp succeeded. He got the money. The final form taken by the transaction was a sale by the Stopperts to the plaintiff, Mrs. Wilcox, who had been introduced to the deal by Mr. Feldkamp. As we have stated, the adjusted sale price from the grantors was $20,608.39. Of this sum approximately $5,608 was paid by defendant Moore, the balance of $15,000 being supplied by Mrs. Wilcox. The title thus acquired, Mrs. Wilcox immediately sold on land contract to defendant Moore (and wife) for the sum of $21,001, the contract providing for the payment of $1 down and the balance in monthly instalments of $225 with interest at 6% per annum. Defendant's position (upon plaintiff's attempted foreclosure of the land contract) is that the transaction is shot through with usury, that the transaction was not a bona fide sale to him but a loan, with plaintiff taking the title merely as security, and that for the loan of $15,000 required by defendant Moore to complete his purchase, Mrs. Wilcox was to get $21,001, plus 6% interest.

Plaintiff, on the other hand, insists that she purchased the property in good faith without actual knowledge of any asserted interest on the part of the Moores. As to Feldkamp's alleged knowledge, plaintiff says he was not her agent, except for "a special and limited agency," limited to the collection of payments made on the land contract "and having no relation to the negotiations for the purchase of the property." Moreover, it is said, and the trial court agreed, "it was no more than 'doubtful conjecture'" that even Feldkamp knew of any interest the Moores may have had in the property.

On the full record, however, this last point (Feldkamp's knowledge) requires no extended discussion. He himself admits, time and again, that he knew the Moores had paid money on the property. The

following are only portions of the pertinent testimony:

"*Q.* You knew then at the time Mr. Moore was at your office, or sometime later, that he had paid some money on that property?

"*A.* Yes. * * *

"*Q.* You told us you knew Mr. Moore had paid some money on the property?

"*A.* Yes.

"*Q.* He told you he was unable to go through with the transaction?

"*A.* Yes."

Moreover, it was Feldkamp himself who took to the White Brothers, when the deed was delivered, not only Mrs. Wilcox's check for $15,000, but one received from defendant Moore for $2,500. (Moore had previously, testified Willis Cushman, Salesman for White Brothers, paid $3,100 on the property.) Mr. Feldkamp's reply "I cannot recall" to the question "Did Mr. Moore tell you what he was giving you the $2,500 for which you took out to White Brothers?" verges on the incredible. But it is not the least incredible of the Feldkamp positions, for he represents to us that, although he knew Moore had put money into the property, he never found out exactly how much, that although he knew there was "supposed to be a receipt" therefor, he never examined it, and that although he knew it was customary for a purchaser to get a preliminary agreement upon paying a deposit, he never saw the one Moore swears he showed him, nor, apparently, did he make any effort to see the seller's or broker's copy thereof. The ignorance so carefully hoarded does not, however, protect him. It is not necessary that he know the precise extent of the Moore interest. It suffices, for equity, that he know of its existence.

The matter of Feldkamp's agency is hardly more involved. It is plaintiff's claim, as above noted,

that "the only time he [Feldkamp] acted as plaintiff's agent was when he collected the land-contract payments." Again, this does not comport with the record. Mrs. Wilcox testified that he approached her for the purpose of buying the property and had told her (apparently in spite of his ignorance) that it was a good deal. Following such approach, she continued, he acted for her in all details of the transaction. The following is her testimony:

"Q. Now, you have also told us that the further negotiations in connection with this property, the paying of your money, being present at the closing and taking the deed, was done for you by Mr. Feldkamp, is that correct?

"A. Yes."

Plaintiff's personal connections with the whole transaction were slight indeed. She and a friend once drove by the house. She visited the property once with Mr. Feldkamp, at which time (the second week in January) the Moores were there. They were not, she says, living there, although Mr. Cushman, salesman for White Brothers, testified that they moved in about December 27, 1955. Be that as may, Mrs. Wilcox was in the house but once. She had no idea of what it was worth. She never met the grantors ("Mr. Feldkamp took care of that for me"). She had no conversations whatever respecting finances with defendant Moore. Who engineered this transaction? Who weighed the possible risk against the possible gain? Did it simply spring into existence, full grown, without human intervention? We are all familiar with successful combinations of unique talents, the arts of the diagnostician combining with the skills of the surgeon to effectuate the successful cure, the forensic prowess of the trial lawyer complemented and enhanced by the analytical skill of his research associate, but here is a com-

bination of talents more singular: an agent who knows next to nothing of a transaction pools his ignorance with that of his principal, who knows even less, the fortuitous merger of ignorances resulting in "a good deal" for her and a good fee for him.

But, in point of fact, someone was acting for Mrs. Wilcox and that someone, by her own admission, was Feldkamp. It was he who, after approaching her "for the purpose of buying property" and putting "forth the usual inducements to buy" (the words quoted are the trial court's) conducted the further negotiations with respect to the property, represented her at the closing, got paid for all of this a fee, and has since collected for her the payments made on the so-called land contract. The agency is established.

There is no need, at this late date in the law of usury (see Leviticus 25: 35–37; Deuteronomy 23: 19, 20; Saint Chrysostom's Fifth Homily on the Gospel of St. Matthew;* CL 1948, § 438.52 [Stat Ann § 19.12]) to discuss its rationale. Suffice to say that its purpose is to protect the necessitous borrower from extortion. In the accomplishment of this purpose a court must look squarely at the real nature of the transaction, thus avoiding, so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form, or the paper tigers of the crafty. We are interested not in form or color but in nature and substance.

It is insisted on the part of appellee that all we have here is a good-faith purchase of property for $15,000 and a subsequent good-faith sale thereof for $21,000, "an outright sale on land contract." It is not to be denied that there are numerous common characteristics existing between the contract of sale

---

* In 10 A Select Library of the Nicene and Post-Nicene Fathers of the Christian Church (Schaff ed, 1888), pp 31, 35.

and purchase on the one hand, and that of loan and mortgage on the other. But as has so often been pointed out by discerning courts there is one situation (possibly above all others) in which "an atmosphere of doubt at once arises." (Judge Denison in *Stark* v. *Bauer Cooperage Co.* (CCA), 3 F2d 214, 216, certiorari denied, 267 US 604 [45 S Ct 464, 69 L ed 809].) This is where we find, again in the words of Judge Denison, that "one recently the indebted owner has shifted his position and become merely an executory purchaser." The court continues (p 216):

"If there is an absolute promise to pay the same amount that he was formerly owing, and to do so as a condition of getting back the title with which he had just parted, the inference that there is nothing but a debt with security for its repayment becomes a strong one; but the debt which creates this atmosphere of doubt is not the new debt, it is the old one.

"So far as we can find, every case in which the existence of an absolute promise by an ostensible vendee to pay the sum involved has been thought to indicate that the transaction was merely a loan instead of having the character in which it was made to appear, is a case where the contract vendee had parted with his recent title and was arranging to get it back again."

The cases on this topic are collected in a valuable annotation in 154 ALR 1063, under the title "Transaction in form a sale, but accompanied by an agreement or option for repurchase by the vendor or a third person previously interested, as a loan, as regards usury law." It is there concluded (p 1079) that:

"Where one who desires to raise money for the purchase of property not owned by him induces another person to purchase the property, agreeing

at the same time to repurchase it from the latter at an advanced price, it seems that, in determining whether, for the purpose of the usury law, the transaction, as between these persons, is to be considered as a loan or a sale and resale, it is an important factor whether or not the final purchaser ever owned a legal or equitable interest in the property prior to the time when the transaction was initiated and consummated."

See, also, *Freedman* v. *Hendershott*, 77 Idaho 213 (290 P2d 738). Likewise in point is *Tillar* v. *Cleveland*, 47 Ark 287 (1 SW 516). Here:

"It appears from the pleadings and proofs in this case that Cleveland, a clerk in a store of which Tillar was one of the proprietors, had made a parol bargain with the owner for the purchase of a lot in Pine Bluff, upon which stood an unfinished dwelling-house. The price of the lot was $150, and it was estimated that $120 would be required to complete the house. And Cleveland applied to Tillar to borrow these several sums, offering security and the payment of the highest rate of legal interest. Tillar replied that his money was worth more than 10% per annum, but proposed to advance the necessary sum, provided the legal title was conveyed directly to himself, and Cleveland would agree to pay rent for 12 months at the rate of $30 a month; after which he would reconvey to Cleveland or his wife. These terms Cleveland was forced by his necessities to accept."

The court held, in part, as follows (p 291):

"The most material inquiry is a question of fact: Were the alleged contracts of purchase and of resale a mere cover for a loan? Our constitutional provision and statute against usury were never designed to interfere with the ordinary transactions of buying and selling, nor to regulate the amount of profit which might be legitimately made in the course of trading either upon lands or chattels. But they

do avoid all agreements for a greater profit in the nature of interest than is allowed by law for the loan of money or forbearance of a debt. This is illustrated by the case of *Ford* v. *Hancock,* 36 Ark 248, where one who had agreed to lend another money at usurious interest to buy corn, afterwards sold him instead, corn on a credit at a price sufficiently above its cash value to cover the agreed interest.

"There is a decided preponderance of testimony to support the conclusion arrived at by the court below. A treaty for a loan had been pending between the parties. Tillar had never seen the lot, although it was situate in the same town in which he was carrying on business. He had no acquaintance with the owner, and it is doubtful whether he ever had an interview with him, although he thinks he held a conversation with him about the state of the title just prior to the consummation of the trade. But his memory about the whole affair is quite indistinct. In fact, he recollects nothing positively except that he was to make a profit of $90 by the transaction. A profit upon what? Evidently for the use of his money."

See, also, *Batchelor* v. *Mandigo,* 95 Cal App2d 816, 823 (213 P2d 762), wherein it is held, quoting the opinion of the trial court:

" 'The rule set forth in 55 Am Jur, Usury, § 24, p 342, does indicate to the court a reasonable line of demarcation between a legitimate business venture with the parties unequal in the extent of their risk but equally eager in their anticipation of profit, and a situation in which a necessitous borrower is victimized by a designing usurious lender. It is there suggested that a transaction is likely to be a loan where the recipient of the money parts with title to *property of his own* as security. On the other hand, the transaction is more likely to be a business venture where the money is used entirely for the purchase of *property not theretofore owned by either* of the persons.' " (Italics are the court's.)

Here it is abundantly clear that what Mrs. Wilcox actually did, knowing (through her agent) of Moore's interest in the property and his necessities, was merely to lend to him the money to complete his purchase, at a substantial (and illegal) bonus, taking the property as security therefor. It is immaterial that the device of purchase and sale was employed. It was actually a loan at usurious interest with mortgage back.

Reversed and remanded for proceedings not inconsistent herewith. Costs to appellants.

BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

DETHMERS, C. J., and CARR, and KELLY, JJ., concurred in the result.