*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANGELO E. IAFRATE, Individually, as Personal
Representative of the ESTATE OF ANGELO
IAFRATE, SR., and as Successor Co-Trustee of the
JOHN IAFRATE IRREVOCABLE TRUST,
REBECCA IAFRATE, as Successor Co-Trustee of
the JOHN IAFRATE IRREVOCABLE TRUST, and
DOMINIC IAFRATE,

UNPUBLISHED
January 27, 2022

Plaintiffs-Appellants,

v

No. 355597
Wayne Circuit Court
LC No. 19-009098-CB

ANGELO IAFRATE, INC., and ROBERT
ADCOCK,

Defendants-Appellees.

Before: GLEICHER, C.J., and BORRELLO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Plaintiffs[1] appeal as of right the trial court's order granting summary disposition in favor
of defendants. We affirm.

## I. FACTUAL BACKGROUND

In 1969, Angelo E. Iafrate Sr. (Angelo Sr.)[2] incorporated Angelo Iafrate, Inc. (the
Company), which was "an earth-moving, road building, construction company . . . " The
Company issued shares to Angelo Sr. and his children: Angelo Jr., Dominic, John, and Anna.
Insofar as we can determine, Anna passed away, and was no longer a shareholder in the Company,

---

[1] For the sake of clarity, we refer to the members of the Iafrate family by their given names, which
conforms with the designations used by the trial court.

[2] Angelo Sr. was initially a plaintiff in this case, but he passed away during the proceedings and
thus the trial court entered a stipulated order to replace Angelo Sr. with his estate.

-1-

before any of the events that gave rise to this case. Although not expressly stated in so many words, John's interests are apparently represented by the John Iafrate Irrevocable Trust, U/A/D January 1, 1988 (the Trust), of which Angelo Sr. was the trustee at relevant times. In 2000, Angelo Sr., Dominic, and John moved to Florida, and Angelo Jr. remained in Michigan and served as the Company's president and sole director. While Angelo Jr. was president, defendant Robert Adcock was the Company's Executive Vice President.

Slightly more than ten years later, Angelo Sr. and the living children assembled a plan to sell the Company to its employees through an Employee Stock Ownership Plan (ESOP). The plan entailed plaintiffs financing 100% of the purchase price through loans to the company, in exchange for which they each received two Promissory Notes (a senior and a junior note) and Common Stock Warrants.[3] Plaintiffs' plan and expectation was that their respective Promissory Notes would be receive equal relative priority, such that their respective junior notes would be paid off at the same time as each other, and their senior notes would be paid off at the same time as each other. The Warrants would then allow plaintiffs to benefit from the growth of the Company after their notes were paid in full.

The plan was effectuated in 2013, when a "new Company was formed" by filing articles of incorporation. Plaintiffs contributed all of their stock to the new entity, and received all 30,000 of its shares. Then the new company formed an ESOP that purchased the 30,000 shares from plaintiffs. The Company provided the Promissory Notes and Warrants for 7,500 shares divided between the plaintiffs. The Promissory Notes required quarterly installment payments. They further provided, in relevant part:

> 1.4 Discretionary Prepayments. Obligor [the Company] may prepay all or part of the principal of this Note at any time . . . Any prepayment made under this Section shall be applied pro rata to the Sellers' [plaintiffs'] [junior or senior] Notes based on the remaining principal balance of each note.

* * *

> 4 Waiver. No waiver by Payee [plaintiff] of any right or remedy under this Note shall be effective except in writing and signed by Payee. Neither the failure nor any delay in exercising any right, power or privilege under this Note will operate as a waiver of such right, power or privilege and no single or partial exercise of such right, power or privilege by Payee will preclude any other or further exercise of any other right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right of Payee arising out of this Note can be discharged by Payee, in whole or in part, by a waiver or renunciation of the claim or right unless in a writing, signed by Payee; (b) no waiver that may be given by Payee will be applicable except

---

[3] A stock warrant is, in general, a contractual right between a person and a company to purchase stock at a specific price and at a specific date. In contrast, stock option is generally a contractual right between two individuals to buy or sell stock at a specific price prior to a specific date. See < https://www.investopedia.com/ask/answers/08/stock-option-warrant.asp >.

in the specific instance for which it is given; and (c) no notice to or demand on Obligor will be deemed to be a waiver of any obligation of Obligor or of the right of Payee to take further action.

The Warrants provided, in relevant part:

> 1. Exercise. This Warrant may be exercised at any time and from time to time by the Holder hereof, subject to the conditions set forth herein . . . In the event that the Warrant is exercised in respect of less than all of the Shares specified herein, a new Warrant evidencing the remaining Shares will be issued by the Company.

> * * *

> 3. Warrant Term. This Warrant shall terminate on, and may no longer be exercised on or after, the date that is 60 days after the date that the Company has paid in full both the Senior Promissory Note and Junior Promissory [sic] issued by the Company in favor of the Holder.

> * * *

> 4[a]. Reservation of Shares. . . . The Shares to be issued upon exercise of this Warrant represent 4.5%[4] of the fully diluted equity interests of the Company at the time this Warrant is executed, and the number of Shares shall be adjusted as determined appropriate by the Company's Board of Directors from time to time to reflect any change in the issued and outstanding equity interests of the Company . . . such that the Shares will represent 4.5% of the fully diluted equity interests of the Company at all times until this Warrant is exercised (in part or in whole) or terminates.

Finally, plaintiffs executed an Intercreditor Agreement amongst themselves "to ensure that no Plaintiff received more favorable treatment than any other when it came to the timing or amount of payments." In relevant part, the Intercreditor Agreement provided:

> 4. Application of Payments and Collateral. In the event a Creditor receives any payment on the Creditor Indebtedness, or any payment or distribution from any of the Collateral,[5] in each case prior to the time all of the Creditor Indebtedness shall have been fully paid, that Creditor shall receive and hold the same in trust for

---

[4] The percentage amount varied among the plaintiffs' individual Warrants; 4.5% was the amount listed in Angelo Sr.'s Warrant.

[5] Plaintiffs were the creditors, the Intercreditor Agreement defined "Creditor Indebtedness" as the total amount due to all four plaintiffs, and it defined the "Collateral" as essentially all of the Company's assets.

the benefit of all Creditors and shall forthwith apply the same Pro Rata against the Creditor Indebtedness.

Although defendants were technically not parties to the Intercreditor Agreement, defendant executed the following Acknowledgement:

> The undersigned, being the Borrower referred to in the foregoing Intercreditor Agreement, hereby acknowledges receipt of a copy of the foregoing Intercreditor Agreement, waives notice of acceptance thereof by the Creditors, consents thereto, and agrees to the foregoing terms and provisions. By execution hereof, the Borrower agrees to be bound by the provisions of the foregoing intercreditor Agreement as they relate to the relative rights of the Creditors in the Collateral. The Borrower further agrees that the terms of the foregoing Intercreditor Agreement are solely for the benefit of the Creditors, and their respective successors and assigns, and that no other party, including the Borrower, shall claim any third-party beneficiary rights or any other rights thereunder.

After the close of the transaction, Adcock became president of the Company, and the board of directors was composed of Dominic, Angelo Jr., and Michael Stefani. Stefani is an attorney who also represented at least two of the Iafrates.[6] In January 2016, Angelo Jr. resigned from the board of directors.

In March 2016, Adcock informed the board of directors that he asked the Company's bonding company for permission to issue a prepayment of $4 million on the Promissory Notes, but that the bonding company had denied the request. After that discussion, Angelo Jr. told Adcock that he would like his portion of any prepayment to be paid to Angelo Sr. In November 2016, Adcock obtained approval from the bonding company to make a prepayment on the amount owed under Angelo Sr.'s Promissory Notes, and, in December 2016, he authorized the Company to issue a payment for that amount to Angelo Sr. In February 2017, Adcock directed the Company to issue payments to Dominic and the Trust for the amounts owed under their Promissory Notes. Adcock contemporaneously asked Dominic to resign from the Company's board of directors, and apparently Stefani resigned as well.[7] In February 2018, Adcock authorized the Company to issue a payment to Angelo Jr. for the amount owed on his Promissory Notes.

Plaintiffs believed that the final February 2018 payment was the triggering event for all four of the Warrants, and all four of them attempted to exercise those warrants. Defendants contended that only Angelo Jr's Warrant was timely and would be honored. The other Warrants had all expired because the Promissory Notes held by Angelo Sr., Dominic, and the Trust had each

---

[6] Defendants characterize Stefani as the "Iafrate family attorney," which does appear to be implied by the record, but we have only found documentary evidence attached to the pleadings showing that Stefani represented Angelo Sr. and the Trust.

[7] It appears that, in the meantime, Adcock had become a director of the board. See *Iafrate v Warner Norcross & Judd, LLP*, ___ FRD ___, ___ (ED Mich) (Docket No. 18-12028), 2021 WL 1232648 at *3.

been paid in full by the Company more than 60 days previously. In April 2018, plaintiffs commenced an action in federal district court, where, in due course, plaintiffs' securities fraud claims were eventually dismissed on the merits, and plaintiffs' remaining state law claims were dismissed without prejudice. See *Iafrate v Angelo Iafrate, Inc*, 827 F Appx 543, 547 (CA 6, 2020). In July 2019, plaintiffs filed their complaint underlying this appeal which primarily concerned defendants' refusal to honor the expired Warrants. Plaintiffs raised four claims: (1) breach of contract, (2) reformation, (3) unjust enrichment, and (4) fraud.

In lieu of an answer, defendants filed a motion for summary disposition under MCR 2.116(C)(8). The trial court granted the motion, following which plaintiffs promptly moved for reconsideration and for clarification. Following the Sixth Circuit's decision in *Iafrate*, plaintiffs filed a supplemental brief in support of their motion for reconsideration and a motion for leave to file an amended complaint. The trial court apparently had not realized plaintiffs filed a motion for reconsideration, but following plaintiffs' supplemental brief, it entered orders denying reconsideration and denying leave to file an amended complaint. This appeal followed.

## II. APPLICABLE STANDARDS OF REVIEW

On appeal, plaintiffs argue that the trial court erred by dismissing their breach of contract, reformation, and fraud claims. Plaintiffs do not challenge the trial court's dismissal of their unjust-enrichment claim. Plaintiffs also contend that the trial court erroneously applied the wrong standard when considering the motion for summary disposition.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*. at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*. at 119-120. However, pursuant to MCR 2.113(C), "[i]f a claim or defense is based on a written instrument, a copy of the instrument or its pertinent parts must be attached to the pleading," unless, in relevant part, the instrument is "in the possession of the adverse party and the pleading so states." Any documents attached to the pleadings are considered part of the pleadings and may be considered by the trial court when deciding a motion under MCR 2.116(C)(8). *El-Khalil v Oakwood Hosp*, 504 Mich 152, 163; 934 NW2d 665 (2019).

This Court reviews questions of contract interpretation de novo. *Burkhardt v Bailey*, 260 Mich App 636, 646; 680 NW2d 453 (2004). The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties," and in so doing, "we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Highfield Beach v Sanderson*, 331 Mich App 636, 654; 954 NW2d 231 (2020) (quotation marks and citation omitted). Courts must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). "[U]nless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005). Generally, "separate agreements are treated separately,"

but if "parties enter into multiple agreements relating to the same subject-matter," then those agreements must be read "together to determine the parties' intentions." *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 148; 881 NW2d 95 (2016).

"Whether a grant of equitable relief is proper under a given set of facts is a question of law that this Court also reviews de novo." *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 371; 761 NW2d 353 (2008). "When considering whether a trial court properly ordered reformation, this Court must be mindful that courts are required to proceed with the utmost caution in exercising jurisdiction to reform written instruments." *Johnson v USA Underwriters*, 328 Mich App 223, 234; 936 NW2d 834 (2019) (quotation marks and citation omitted). "To reform a contract, the facts necessary for the allowance of the remedy shall be proved by clear and convincing evidence and not by a mere preponderance." *Id*. (quotation marks and citation omitted). "Whether a duty exists is a question of law that is solely for the court to decide." *Harts v Farmers Ins Exch*, 461 Mich 1, 6; 597 NW2d 47 (1999).

## III. CORRECT SUMMARY DISPOSITION SUBRULE

As an initial matter, plaintiffs contend that the trial court erred by looking beyond the pleadings when considering defendants' motion for summary disposition under MCR 2.116(C)(8). We find no error.

Plaintiffs attached copies of the Warrants and the Intercreditor Agreement to their complaint, but they did not attach copies of the Promissory Notes. Defendants attached copies of the Promissory Notes to their motion for summary disposition. Our Supreme Court has cautioned that although documents attached to the pleadings may be considered by a court deciding a motion for summary disposition under MCR 2.116(C)(8), the contents of those documents must not be considered as "substantive evidence sufficient to" dispose of the nonmoving party's claims. *El-Khalil*, 504 Mich at 163. In context, however, our Supreme Court was referring to certain emails in that case that had not been adopted by the nonmoving party as true. *Id*. Its holding was therefore nothing more than the unremarkable principle that "[a] motion under MCR 2.116(C)(8) may not be supported by affidavits, depositions, admissions, or other documentary evidence." *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994). In contrast, the Promissory Notes were instruments upon which both plaintiffs' claims and defendants' defenses were based. Moreover, plaintiffs alleged that defendants possessed copies of the Promissory Notes. Therefore, the Promissory Notes, the Warrants, and the Intercreditor Agreement were all properly considered part of the pleadings under MCR 2.113(C)(2).

Plaintiffs do not articulate or identify what other evidence the trial court supposedly considered beyond the pleadings, and the trial court explicitly stated that it based its decision entirely on the legal principles applicable to MCR 2.116(C)(8), despite "the colloquy at oral argument." We find no indication that the trial court improperly considered evidence beyond the pleadings.

Plaintiffs further argue that the trial court necessarily applied the wrong standard because it found that plaintiffs waived pro rata repayment of the Promissory Notes, which is intrinsically a factual determination. Plaintiffs correctly observe that, traditionally, what constitutes a waiver is a question of law, and whether the facts in a case establish such a waiver is a question for the trier

of fact. *Klas v Pearce Hardware & Furniture Co*, 202 Mich 334, 339; 168 NW 425 (1918). However, that does not establish that the trial court considered any evidence outside the pleadings. Furthermore, the distinction between a factual determination and a legal determination is not always so clear. There are circumstances under which a waiver may be found as a matter of law based on undisputed facts. See *Smith v Grange Mut Fire Ins Co of Mich*, 234 Mich 119, 122-123; 208 NW2d 145 (1926). As discussed, the interpretation of contracts is a question of law, and it may be appropriate for a court to determine under MCR 2.116(C)(8) that the legal significance of the facts in the pleadings establishes a waiver. See *Walters v Bloomfield Hills Furniture*, 228 Mich App 160, 165-166; 577 NW2d 206 (1998). Notably, in considering a motion for summary disposition under MCR 2.116(C)(8), the courts must accept as true all factual allegations in the complaint and any reasonable inferences from those factual allegations; however, the courts will not accept a party's conclusions. *State ex rel Gurganus v CVS Caremark Corp*, 496 Mich 45, 63; 852 NW2d 103 (2014). Merely phrasing an allegation as factual does not make it so. See *Wilcox v Moore*, 354 Mich 499, 504; 93 NW2d 288 (1958).

Plaintiffs finally argue that they were not obligated to plead in avoidance of the affirmative defense of waiver. We agree, because "pleading in avoidance" is generally understood to apply in the context of governmental liability. See *Mack v Detroit*, 467 Mich 186, 203; 649 NW2d 47 (2002). Plaintiffs further correctly point out that the party claiming waiver has the burden of proving waiver. See *Patel v Patel*, 324 Mich App 631, 634; 922 NW2d 647 (2018). Affirmative defenses are therefore generally not proper grounds for summary disposition under MCR 2.116(C)(8). See *Booth Newspapers, Inc v Regents of Univ of Mich*, 93 Mich App 100, 108-109; 286 NW2d 55 (1979). Nevertheless, so long as a court does not consider any evidence beyond the pleadings, we do not think it is categorically erroneous *per se* for the court to determine that the pleadings show a claim to be barred by an affirmative defense. See *Glazier v Lee*, 171 Mich App 216, 217-221; 429 NW2d 857 (1988) (applying the affirmative defense of wrongful conduct in a motion under MCR 2.116(C)(8).[8] We are unpersuaded that the trial court erroneously misapplied MCR 2.116(C)(8).

## IV. WAIVER UNDER PROMISSORY NOTES

Plaintiffs argue that the trial court erred by ruling that plaintiffs waived the pro rata prepayment term of the Promissory Notes on the grounds that the court disregarded both plaintiffs' allegation that the Trust never consented to any non-pro-rata prepayments, and the nonwaiver term in the Promissory Notes. We are not persuaded.

"[A] waiver is a voluntary and intentional abandonment of a known right." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003). "It is well

---

[8] See also *Rauch v Day & Night Mfg Corp*, 576 F 2d 697, 702 (CA 6, 1978), discussing application of an affirmative defense where a "claim is adequately stated, but in addition to the claim the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim . . . the complaint is said to have a built-in defense and is essentially self-defeating" (quotation omitted). "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v General Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

settled that a course of affirmative conduct, particularly coupled with oral or written representations, can amount to waiver." *Id*. at 379. Furthermore, "it is well established in our law that contracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their restrictive amendment clauses . . . because the parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed." *Id*. at 372. However, any such alteration to the original contract must be demonstrably mutual, and an anti-waiver provision in the original contract is highly relevant to assessing the parties' subsequent course of conduct. *Id*. at 372-375.

"Magic words are unnecessary to effectuate a valid waiver, but a waiver must be explicit, voluntary, and made in good faith." *Patel*, 324 Mich App at 634. "In order to ascertain whether a waiver exists, a court must determine if a reasonable person would have understood that he or she was waiving the interest in question." *Id*. "Thus, a valid waiver may be shown by express declarations or by declarations that manifest the parties' intent and purpose, or be an implied waiver, evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." *Id*. (quotation marks and citations omitted).

As set forth above, the Promissory Notes and the Intercreditor Agreement[9] both contained provisions that clearly anticipated the possibility of irregular payments made on a single Promissory Note instead of all Promissory Notes. Under § 1.4 of the Promissory Notes, the Company appears to be obligated to apply discretionary prepayments pro rata to all Promissory Notes of the same priority level (i.e., all senior or all junior Notes). Notwithstanding the anti-waiver provision, Angelo Jr. told Adcock "that if the Company was going to make a prepayment on the Senior and Junior Notes, that his portion of any prepayment should be paid to Angelo Sr. due to Angelo Sr.'s age." Defendants proceeded to issue a payment of $5.4 million on Angelo Sr.'s Promissory Notes. Plaintiffs alleged that Angelo Sr. held that amount in trust for all plaintiffs pursuant to the Intercreditor Agreement. By necessary implication, Angelo Sr. accepted the payment. Furthermore, at that time, Dominic and Stefani were still on the Company's board of directors, and Angelo Sr. was the trustee of the Trust. It is starkly inescapable that plaintiffs and defendants all mutually agreed to waive the pro-rata provision of § 1.4 of Angelo Sr.'s Promissory Notes.

In February 2017, nearly two months after the Company paid $5.4 million to Angelo Sr., Adcock directed the Company to issue payments to Dominic and the Trust for the amounts owed under their Promissory Notes, which was $9,742,485.08 and $3,395,102.86, respectively. Plaintiffs alleged that Dominic and the Trust held their payments in trust under the terms of the Intercreditor Agreement. Again, Dominic and Stefani were still on the board until after those payments were made, and by necessary implication, Dominic and Angelo Sr. (the latter as trustee of the Trust[10]) accepted the payments. Also again, there is no way to interpret these undisputed

---

[9] We will discuss the Intercreditor Agreement below.

[10] Plaintiffs argue that the Trust never consented, but this conclusory assertion is belied by the actual facts alleged by plaintiffs. Indeed, plaintiffs alleged that the Trust's then-trustee, Angelo Sr., accepted non-pro-rata prepayments in both his personal capacity and in his capacity as a trustee.

facts as anything other than a mutual waiver, through a course of conduct, of § 1.4 of Dominic's and the Trust's Promissory Notes.

Plaintiffs generally contend that defendants breached the pro-rata provisions of the Promissory Notes, which, as discussed, caused three of the four Warrants to be triggered earlier than plaintiffs anticipated. However, the trial court correctly found that the parties, through their affirmative and fully admitted conduct, mutually waived the pro-rata provisions. The trial court recognized the anti-waiver provision, but it correctly recognized that the anti-waiver provision was not dispositive under the circumstances.

## V.  BREACH OF THE INTERCREDITOR AGREEMENT

Plaintiffs argue that the trial court erred by ruling that defendants were not party to the Intercreditor Agreement and by overlooking the pro rata payment term of that agreement. We disagree.

It is manifestly apparent on its face that defendants were not, in fact, parties to the Intercreditor Agreement. The Intercreditor Agreement states at the outset that it was between Angelo Sr., Dominic, Angelo Jr., and the Trust. None of the provisions in the Intercreditor Agreement appear to place any obligations or responsibilities upon the Company or upon Adcock, and it specifically stated that the Company was not a beneficiary of the Agreement. The Company's president at the time, Angelo Jr., signed a separate acknowledgment indicating that the Company "agree[d] to the foregoing terms and provisions," none of which, as noted, imposed any obligations upon the Company. As set forth above, the acknowledgement stated that the terms of the Intercreditor Agreement were "solely for the benefit of" plaintiffs, and the only specific obligation the Company undertook was to respect "the relative rights of the Creditors in the Collateral." Nowhere in the Intercreditor Agreement was a non-pro-rata payment on a Promissory Note forbidden; to the contrary, § 4 unambiguously anticipated that such non-pro-rata payments might occur. Under such an eventuality, the Company had no obligations; rather, the recipient of the payment was obligated to hold the payment in trust for the other plaintiffs.

The trial court properly found that defendants were not parties to the Intercreditor Agreement. Furthermore, the Warrants did not reference or rely upon the Intercreditor Agreement. Although the Promissory Notes prohibited non-pro-rata payments, the parties waived that prohibition. The Intercreditor Agreement only established obligations as between plaintiffs, and the Company only agreed to respect plaintiffs' obligations as between each other. Plaintiffs do not explain how their agreement to hold any payments in trust for one another prevented individual Promissory Notes from being extinguished until all of them were paid in full. Although plaintiffs agreed to hold any payments that they received from the Company in trust so that those payments could be applied pro rata among themselves until all of the Promissory Notes were satisfied, the Intercreditor Agreement did not restrict the Company's prerogative to satisfy individual Promissory Notes with non-pro-rata prepayments. The Intercreditor Agreement also did not, for example, obligate any recipient of a non-pro-rata payment to refuse that payment. Any acceptance of such payment would necessarily constitute valid payment by the Company on that particular Promissory Note.

## VI.  BREACH OF THE WARRANTS

Plaintiffs contend that the trial court erred by failing to address how the Company was required to reissue, amend, or restate the Warrants.  We conclude that the Warrants did not require the Company to take those actions.

As an initial matter, we observe that the trial court correctly applied the plain language of the Warrants, which, as set forth above, unambiguously refer to "the date that *the Company has paid* in full both the Senior Promissory Note and Junior Promissory [sic] issued by the Company in favor of *the Holder*" (emphases added).  The only possible interpretation of this language is that the specific Warrant would be triggered when the particular Promissory Notes held by *the holder of that Warrant* were paid *by the Company*.  Plaintiffs apparently expected that all of their Promissory Notes would be paid off at the same time.  However, they did not structure their contracts to make a simultaneous payoff inescapable, and they waived the provisions that should have resulted in their payoffs being simultaneous.  Notably, they could easily have drafted their Warrants in such a way that they would be triggered only after the last Promissory Note was paid in full.  As discussed, we enforce the plain language of contracts as written, and as written, the outcome in this matter was fully permitted.

Plaintiffs argue that defendants committed the first material breach of the Warrants by violating § 4.a. of the Warrants, which plaintiffs characterize as an "anti-dilution provision, providing that the number of shares recited in the Warrants would collectively at all times represent 20% of the Company's full diluted equity interest" (emphasis omitted).  Plaintiffs argue that the Company issued additional shares, which altered the Company's equity interests and therefore mandated reissuance of each Warrant.  Generally, one party's initial substantial breach of a contract may excuse the other party's nonperformance of its obligations under that contract.  *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 613; 792 NW2d 344 (2010).  However, the breach must be substantial, meaning the breach in some way precluded or drastically undermined either the other party's ability to perform or the essential purpose of the contract.  See *Baith v Knapp-Stiles, Inc*, 380 Mich 119, 126; 156 NW2d 575 (1968).

Accepting as true that defendants indeed breached the Warrants by failing to reissue them, the evidence does not show that defendants diluted the Company's equity to the point of rendering the Warrants shams.  More importantly, the evidence does not show that any reissuance of the Warrants would have entailed changing any terms other than their number of shares.  Reissuance would therefore not have altered the legal effect of plaintiffs' waiver of the Promissory Notes' prohibition against non-pro-rata payments.  Accordingly, the "first substantial breach" doctrine is inapplicable.

## VII.  REFORMATION OF THE WARRANTS

Plaintiffs argued below that reformation of the Warrants was necessary because there was both a mutual mistake between the parties and a unilateral mistake on the part of plaintiffs.  The trial court disagreed, and it ruled that plaintiffs' reformation claim failed because their complaint failed to allege a mutual mistake or actionable fraud.  On appeal, plaintiffs also argue that an amended contract was created after plaintiffs waived the pro rata prepayment term of the Promissory Notes; that the amended contract was composed of the amended Promissory Notes,

the Warrants, and the Intercreditor Agreement; and that their reformation claim was directed at the amended contract because that agreement failed to reflect the parties' intent that the Warrants all be exercised on a single date. We find that plaintiffs' latter argument is not readily apparent from the lower court record, because plaintiffs' complaint and argument in the trial court focused solely on reforming the Warrants rather than a novel amended gestalt contract. We therefore find the latter argument unpreserved. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020).

"Michigan courts sitting in equity have long had the power to reform an instrument that does not express the true intent of the parties as a result of fraud, mistake, accident, or surprise." *Johnson Family Ltd Partnership*, 281 Mich App at 371-372. "Courts will reform an instrument to reflect the parties' actual intent where there is clear evidence that both parties reached an agreement, but as the result of mutual mistake, or mistake on one side and fraud on the other, the instrument does not express the true intent of the parties." *Mate v Wolverine Mut Ins Co*, 233 Mich App 14, 24; 592 NW2d 379 (1998) (quotation marks and citations omitted). A contract drafted as the parties intended will not be reformed merely because the parties were mistaken about the contract's legal effect. *Schmalzreidt v Titsworth*, 305 Mich 109, 119; 9 NW2d 24 (1943). In contrast, a mistake in drafting an instrument, such that the contract as written does not reflect the parties' agreement, may warrant reformation of the instrument to comport with the parties' intentions. *Id*. at 119-120. A unilateral mistake may warrant reformation where the mistake was induced by fraud, or where one party knew the contract did not accurately express the other party's intentions and concealed that other party's misapprehension. *Johnson Family Ltd Partnership*, 281 Mich App at 380.

Plaintiffs argue that their "claim for reformation of the parties' contract is founded upon the fact that the contract does not accurately carry out the parties' intent, and reformation is sought to conform the parties' contract to the actual intent of the contracting parties." We accept that the Promissory Notes, Intercreditor Agreement, and Warrants should be considered together. See *Wyandotte Electric Supply Co*, 499 Mich at 148. However, plaintiffs' argument is that some term was omitted from the contract, or defendants were aware that the contract did not reflect plaintiffs' intentions and failed to correct the misapprehension. The former theory requires that a term agreed to by the parties never made its way into a written instrument. Plaintiffs do not articulate what that term might be.[11] The latter theory appears to be that Adcock realized before plaintiffs did that a Warrant-triggering event had occurred and failed to warn plaintiffs of that event. However, plaintiffs misapprehend the kind of unilateral mistake that will give rise to reformation: the mistake must be as to the inadvertent inclusion or exclusion of terms in the contract.[12] See *Woolner v*

---

[11] Insofar as we can determine, plaintiffs contend that a new contract was created that, for reasons we find difficult to follow, somehow called for terms other than simply the original contract with the pro-rata payment prohibition waived. Even if we were to accept this theory, it does not amount to a claim that the parties negotiated an agreement that, when reduced to writing, omitted a term without their knowledge.

[12] In the context of an oral contract, the equivalent would be one party misspeaking without realization, the other party knowing the first party misspoke, and the other party nevertheless

-11-

*Layne*, 384 Mich 316, 318-319; 181 NW2d 907 (1970); *Baryton State Savings Bank v Durkee*, 325 Mich 138, 140-142; 37 NW2d 892 (1949).

Ultimately, the facts as set forth by plaintiff and in the pleadings simply show that plaintiffs failed to understand the legal ramifications of their waivers of the prohibitions against pro-rata payments. The trial court properly refused to reform the parties' contract.

## VIII. FRAUD

Plaintiffs contend that the trial court erred by dismissing their fraud claims. We disagree.

The trial court dismissed plaintiffs' fraud claims on the basis of collateral estoppel, holding that the dismissal of plaintiffs' securities fraud claims in federal court precluded plaintiffs' common law fraud claims. "Collateral estoppel bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006). Collateral estoppel may bar subsequent litigation in state courts based on issues determined in a prior federal action. *Pierson Sand and Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 380-381; 596 NW2d 153 (1999). The trial court also held that, in any event, plaintiffs failed to plead the necessary elements of fraud.

Plaintiffs' fraud claim is based in part on the general contention that Adcock undervalued the Company's performance, which undermined the value of the stock to be redeemed under the Warrants. Having determined that the Company properly regarded all but Angelo Jr.'s warrants as expired, this claim applies only to Angelo Jr.'s Warrant. Plaintiffs' securities fraud claim in federal court alleged a violation of the Securities Exchange Act, 15 USC § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 CFR § 240.10b-5, for precisely that reason: that Adcock and the Company had intentionally undervalued the Company's stock price in an effort to manipulate the value of the Warrants. *Iafrate*, 827 F Appx at 546-547. Consistent with the allegations in the complaint in this matter, the federal courts observed that Adcock admitted to the undervaluing to Angelo Jr. before Angelo Jr. exercised his Warrant. *Id*. at 551. In Michigan, as in federal courts, an essential element of fraud is that the plaintiff not only relied on a misrepresentation but did so genuinely and reasonably. *Cooper v Auto Club Ins Ass'n*, 481 Mich 399, 414-415; 751 NW2d 443 (2008).[13] Plaintiffs alleged that Angelo Jr. relied on defendants' "materially false and misleading statements" and upon an earlier presentation regarding the methodology to be used in calculating the fair market value of the stocks. However, as the Sixth Circuit found, Angelo Jr. actually knew that defendants had manipulated the Company's stock value and, instead of challenging the valuation or suing for breach of contract immediately, he

---

holding the first party to their word. Again, the evidence as set forth by plaintiffs shows that they knew what they had agreed upon, they simply did not realize the secondary consequences.

[13] Although *Cooper* addressed fraud in an insurance context, it has long been established that "fraud is not perpetrated upon one who has full knowledge to the contrary of a representation." *Beverly v Richards*, 255 Mich 508, 514; 238 NW2d 270 (1931).

chose to exercise the Warrant despite that knowledge. *Iafrate*, 827 F Appx at 551-552. Even if the federal decision lacked preclusive effect, we would agree with its conclusion that plaintiffs have not alleged actionable fraud on this basis.

Plaintiffs also alleged that defendants never warned plaintiffs that the Warrants would be triggered, despite knowing that plaintiffs believed the Warrants would not be triggered and despite a request from Angelo Jr. that Adcock document how the non-pro-rata payments might alter plaintiffs' understandings. In the trial court, plaintiffs contended that Adcock owed them a fiduciary duty, the exact nature of which seems never to have been made clear. On appeal, plaintiffs provide only a cursory argument with no citation to authority. We could consider this argument waived. *Wolfe v Wayne-Westland Community Sch*, 267 Mich App 130, 139; 703 NW2d 480 (2005). Nevertheless, we presume plaintiffs are probably referring to the common-law duty of candor, under which a fiduciary or quasi-fiduciary may have an affirmative duty of disclosure under some circumstances. See *Tomkins v Hollister*, 60 Mich 470, 479; 27 NW 651 (1886); *Barrett v Breault*, 275 Mich 482, 491; 267 NW2d 544 (1936). Plaintiffs' allegations essentially articulate a claim for fraudulent misrepresentation, which requires an affirmative duty to disclose. *Titan Ins Co v Hyten*, 491 Mich 547, 557; 817 NW2d 562 (2012).[14]

It is far from clear that Adcock did owe a fiduciary duty to plaintiffs. The trust a plaintiff places in a defendant alleged to be a fiduciary must be reasonable. *Prentis Family Foundation v Barbara Ann Karmanos Cancer Inst*, 266 Mich App 39, 44; 698 NW2d 900 (2005). Presuming Adcock owed a fiduciary duty to plaintiffs, a claim of fraudulent misrepresentation does not require diligence on the part of plaintiffs. *Titan Ins Co*, 491 Mich at 557. However, a plaintiff may not "wilfully close his eyes to that which others clearly see." *Id*. at 562. Plaintiffs could have read the plain and unambiguous language of their Warrants. Although there are rare circumstances under which failing to advise someone of the law—which all persons are otherwise presumed to know—may be actionable, generally something more than mere silence is required, even where a fiduciary relationship exists. *Tompkins*, 60 Mich at 480-484. In any event, as discussed, the prepayments on the Promissory Notes did not change the nature of the transaction as plaintiffs argue; rather, plaintiffs simply did not understand their own contracts. Especially in light of their

_____

[14] As the federal courts found, "[p]laintiffs fail to identify any affirmative statement by Defendants establishing that the Company would only apply prepayments *pro rata*, that even if non-*pro-rata* prepayments were made they would not trigger the warrant-exercise period, or that the Warrants would be redeemed automatically," and "Plaintiffs do not allege, with sufficient particularity, statements establishing the Company's commitment to [only apply prepayments *pro rata* or to automatically redeem the Warrants] in the first place." *Iafrate*, 827 F Appx at 549. We would agree with this assessment, irrespective of whether *Iafrate* has preclusive effect. Consequently, this theory turns on whether defendants had an affirmative duty to disclose.

cursory argument, we are unpersuaded that plaintiffs have articulated a duty on the part of defendants to explain what those contracts stated or that defendants intended to honor the contracts as they were actually written.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause